PER CURIAM.
This case is before the Court on appeal from the conviction of Randall T. Deviney for the first-degree murder of Delores Futrell and sentence of death. A jury recommended death by a 10-2 vote. The trial court accepted that recommendation and sentenced him to death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons provided below, we reverse and remand for a new trial.
FACTS
On the evening of August 5, 2008, Officer Sherry Milowicki of the Jacksonville Sheriffs Office was on patrol near the townhome of Delores Futrell. At approximately 10:00 p.m., the police dispatcher received an unverified 911 call[1] from Fut-rell’s residence. The police dispatched Mi-lowicki and another officer to Futrell’s townhome. The officers, because they did not know who called 911, approached Fut-rell’s townhome quietly without the use of sirens or emergency lights and, upon parking, cautiously approached Futrell’s home on foot. The time of the officers’ arrival was approximately 10:35 p.m.
As the officers approached the front door, they noticed that the interior lights and the television were on. However, when the officers looked in the front window they saw no one and they received no response to a knock on the front door. They entered the premises through an unlocked front door. They found an elderly woman later identified as Futrell lying on the living room floor. The officers observed that the woman was dead and her throat had been cut from ear to ear. The victim was partially naked with her shirt pulled up over her torso, her pants were removed, the crotch of her underwear had been ripped open, and her underwear had been pulled up and over her hips. Fut-rell’s bra had been cut, and the left side of her bra was stained with blood. To Milow-icki, it appeared as though Futrell’s body had been purposely posed in this manner. Milowicki described the pose as “unnatural” because of the odd positioning of Fut-rell’s legs.
Inside the home, the officers also observed bloody blue jeans, probably worn by Futrell, by the back door near an ironing board. A table was in disarray, which was unusual given the orderly appearance of the rest of the townhome’s interior. On the table a cordless phone was off its charger base. Based on the phone’s call log, the police determined that someone had used the phone to call 911 at 10:01 p.m. There was no blood on the cordless phone. The contents of a purse had been emptied onto the couch in the living room, but Futrell’s wallet was found on the ironing board near the back door of the town-home. Someone had removed the credit cards and paper from the wallet and left *61 them on the ironing board. The police found no paper currency in the wallet, but did find fifty-six cents. There were no signs of a struggle inside the home, no signs of forced entry into the home or backyard, and the townhome was not otherwise disturbed.
After additional police units arrived, Mi-lowicki proceeded out the townhome’s back door, through a screened-in patio, and to the backyard. As she walked to the center of the back yard, her flashlight revealed a large pool of blood. In the northwest portion of the backyard, Milowicki observed a Koi fishpond with cornerstones stained with blood. She also located a small section of a knife blade a few feet from the large pool of blood. There was grass and blood on the blade. In addition, a trail of blood led to a chair near the back door, stopping on the chair’s armrest.
Detective Tracey Stapp of the Jacksonville Sheriffs Office arrived at the scene around midnight that same evening. In addition to Milowieki’s observations, Stapp found more blood on the side of the Koi pond, along with droplets of blood on the pond’s ledge. Stapp noticed blood on the back door, the screen door of the porch, and the porch chairs, along with aspirated blood[2] on the chair and on the chair’s edge. She found grass on Futrell’s shoulders, hands, back, fingers, and arms. There was also blood on the bottom of Futrell’s feet, and there were scrapes on her back near her panty line.
According to Stapp, there was very little blood inside the townhome. Based on Stapp’s observations, she believed that Futrell’s throat had been cut in the general area of the Koi pond and where the large pool of blood was found. It appeared that Futrell lost most of her blood in the backyard, and that she had been dragged inside after her throat was cut outside. Based on the location of the bloodstained blue jeans, Stapp believed that Futrell’s jeans had been removed inside the townhome.
Dr. Jesse C. Giles, M.D., a forensic pathologist, performed an autopsy on Futrell the day after her death. Futrell was sixty-five inches tall (5'5"), weighed 138 pounds, and was sixty-five years old. Giles determined that the cause of death was hypovolemic shock with asphyxiation due to incised wounds of her neck’s laryngeal transection, i.e., Futrell bled to death due to the large cut across her neck that sliced her larynx, which impeded her ability to breath. Giles opined that the manner of death was a homicide. Based on the nature of Futrell’s wounds, Giles concluded that a struggle occurred before Futrell’s throat was cut.
Giles described Futrell’s neck injury as caused by sharp force, i.e., a slicing of the skin caused by a sharp object, such as a knife. The wound was a deep cut that began on the right side of Futrell’s neck at the bottom of her ear, continued across the front of her neck, and stopped at the left side of her neck. The sharp object sliced completely through her voice box (i.e., larynx), and cut halfway through her esophagus, which is located behind the larynx. The cut also entered her jugular vein, which caused continuous, substantial, and unimpeded blood loss that flowed from the neck. Some of the blood proceeded down the inside of Futrell’s throat, with air continuing to come in and out of the neck wound as she bled to death. Giles stated that an individual is typically unable to speak after the infliction of such an injury.
*62 Giles believed that Futrell was still alive and breathing when someone inflicted the neck wound. The finding of aspirated blood inside Futrell’s neck, internal airway, and left lung supported this conclusion. Giles opined that the cut to the neck — especially the slicing of the jugular vein — was the fatal wound with the blood loss from the wound causing her death in a matter of seconds to minutes after the wound occurred. Giles opined that the cause of death was blood loss and not suffocation from the blood because there was not enough blood in Futrell’s lungs to cause suffocation. The pattern on the skin around the neck wound indicated that the instrument used was a serrated object similar to a steak knife. In Giles’s opinion, this wound was inflicted with a single, firm slice across the neck. Giles was of the view that an individual could survive this type of wound if qualified medical personnel had treated the wound immediately after it occurred.
Giles also found blunt force injuries to Futrefl’s neck. Blunt force is the application of force onto the body with a non-sharp object, caused either by the object hitting the body, or the body hitting the object. Giles specifically observed evidence of crushing blunt force upon Fut-rell’s upper neck that fractured the hyoid bone. The fracturing occurred on both sides of the hyoid bone which broke the bone down the middle. In addition to this fracture was the fracture of the cartilage of Futrell’s voice box. This injury was consistent with manual strangulation by a blunt object, like a forearm. According to Giles, the cut to the throat occurred first because the fracture stopped above the cut. She believed that, had the fracture been first, it would have continued above and below the cut, and there would have been more bruising around the neck. She opined that Futrell was strangled either while she was dead or still dying from her neck wound.
In addition to the neck injuries, Futrell also had injuries to other parts of her body caused by blunt and sharp forces. These injuries included abrasions and contusions around her left eye, scrapes and linear scrape abrasions on the left side of her nose area around her lips, and abrasions on the left corner of her mouth with bruising and small tears to her lip. She had abrasions with a yellowish tint on the right side of her face and corner of her mouth. The tint indicated that the injury occurred after Futrell had lost a large amount of blood because the yellow color indicated that not much blood remained in her body when the injury occurred. The bruises on Futrell also included six small bruises on her arms and hands. Giles opined that these were defensive wounds. Giles also described other minor injuries and small cuts on Futrell’s chest, shoulders, arms, and forearms. Giles opined that the injuries were from Futrell being dragged, or, more likely, from the impact of a struggle. Giles also did not rule out the possibility that some of Futrell’s minor injuries may have been caused by the removal of her clothing.
The police used a sexual battery kit to test Futrell’s vaginal, anal, chest, and mouth areas for evidence of a sexual battery. In those areas, the police found no semen or DNA foreign to Futrell, and there was no evidence of trauma to Fut-rell’s sexual organs. There were also no injuries to the breast, anal, or genital area indicative of a sexual assault. Giles believed the evidence established that an actual sexual battery did not occur. However, Giles stated that the absence of such injuries does not negate a possible attempted sexual battery, and she could not definitively conclude that an attempted sexual battery did not take place. The *63 police also did not find foreign DNA in Futrell’s townhome or on any objects therein, including the cordless phone, wallet, purse, or blue jeans.
The police also swabbed Futrell’s fingernails for foreign DNA. The police found no DNA foreign to Futrell on her left hand fingernails. However, the police obtained a mixture of DNA, which contained the DNA of one male and one female from the nails of her right hand. The police identified the female DNA as belonging to Fut-rell. Jennifer Miller, a DNA analyst for the Florida Department of Law Enforcement, placed the male DNA into the national database comprised of DNA profiles from violent crimes, known as the CODIS system. The CODIS system identified the DNA found under Futrell’s fingernails as belonging to Randall T. Deviney, a nineteen-year-old male and the defendant in this matter.[3] Miller also determined that the probability of a person other than De-viney having a DNA profile that matched the DNA located under Futrell’s right fingernails was one in 2.5 million for Caucasians, one in 6.3 million for African Americans, and one in 9.7 million for Hispanics.
Miller sent her results to Detective Craig Waldrup of the Jacksonville Sheriffs Office, the lead homicide detective in this case. Waldrup used the DNA evidence to obtain a search warrant authorizing him to take a sample of Deviney’s DNA. Waldrup arranged to have Deviney brought to the police station for an interview by Detective James Ottinger, who was part of the homicide team involved in the Futrell investigation.
Ottinger located Deviney and identified himself and his partner as police officers. They advised Deviney they were investigating the murder of Futrell and asked if he would come to the police station with them to discuss Futrell’s murder. Devi-ney consented.
Deviney was transported to the police station in Ottinger’s car. The officers did not handcuff Deviney, who sat in the front passenger seat next to Ottinger, and the officers did not question him about Fut-rell’s murder. Ottinger’s partner sat in the back seat behind Deviney. According to Ottinger, Deviney was not in custody at this time.
Upon arriving at the police station, the officers directed Deviney to an interview room. He walked with the detectives and was not placed in any type of restraints. When he entered the interview room, the police informed him that he was not in custody, he was not under arrest, the door was unlocked, and he could leave at any time. He specifically asked the detectives if he was free to leave and the detectives told him that he could. The police video-recorded the interview and provided the trial court with a DVD of that interview.
At the beginning of the interview, Waldrup and Ottinger cordially introduced themselves to Deviney. They reiterated to Deviney he was not under arrest, and he replied he understood, and he knew “you all just want me to help you all.” Deviney acknowledged that he understood that he was there voluntarily, that the door to the interview room was unlocked, and he could leave at any time. After Deviney stated that he understood he was free to leave, the detectives administered Miranda[4] warnings. Deviney read his Miranda rights aloud from a form that he signed, and the two detectives signed as witnesses. While Deviney reviewed his Miranda *64 rights, he noted that he was familiar with his rights and the criminal justice system because he had prior contact with the system and police, as this was not his “first rodeo.”
The police then engaged in small talk with Deviney, discussing his personal and professional life, as well as his mental and physical condition. They asked him if he had any drugs or alcohol in his system. The only drug he admitted to recently ingesting was an energy drink. Deviney told them that his last meal was the previous morning at 1:00 a.m., and he had obtained a full night’s sleep. The interview began around 3:00 p.m.
The detectives proceeded to question Deviney about Futrell’s murder and their subsequent investigation of the murder. Deviney stated he knew Futrell and that he had heard about her death. The detectives asked him if he knew who did it, to which he responded, “No, sir.” The detectives asked him if he was suspicious of anyone, to which he responded, “No, sir.”
When asked what he was doing on the day of the homicide, Deviney responded by stating that about two weeks prior to the murder, he went to Futrell and asked for $20. Futrell agreed to give Deviney $20 in exchange for yard work. After he completed the yard work, Futrell paid him $20. Deviney stated that he agreed to return in two weeks and, when he returned at that time, he found a crime scene in front of Futrell’s townhome and learned of her murder.
Deviney claimed to have followed the murder investigation because he “never even stop[ped] thinking about it. Ms. Delores [Futrell] was like my Godmother.” Deviney noted that he and his father helped build and maintain Futrell’s Koi fishpond. He also stated that he had known her for about seven years, she had made raisin cookies for him and his little brother, and she had given them rides home if she saw them walking. He also noted that Futrell had an American bulldog named Prince, and that he and his brother helped walk the dog for her. He knew it was hard for her to walk the large dog because she had multiple sclerosis “real bad.” Deviney knew Futrell’s male companion, Hartwell Perkins, had taken the dog with him to New York for the summer because Futrell was in a weakened condition.
On the night of Futrell’s murder, Devi-ney stated that he was at home, but that he left his house around 8:30 p.m., and he returned home by 9:00 p.m. During that time, Deviney claimed to have stopped by his neighbor’s house for a beer. According to Deviney, he never left his street (Futrell’s street was one over). He also stated that he did not go to Futrell’s town-home, or anywhere near it, on the night of her murder. He admitted to attending her candlelight vigil and walking through her house during the vigil. He claimed to have touched nothing.
The detectives then asked Deviney a series of questions to clarify his whereabouts on the night of the murder and his knowledge of the murder. During this questioning, Deviney stated, “I really cared about [Futrell]. Still do.” He believed that whoever murdered Futrell was a “very sick person.” He stated that whoever committed the murder had to know her because she “would not open her door for anybody that she didn’t know,” and she would not allow a stranger into her home because she was slow and weak due to her multiple sclerosis. Then, Deviney became impatient and asked if the interview was “about done” because “this aggravates me.” When asked how he thought the investigation was “going to turn out for him,” Deviney responded, “I don’t know.”
*65 The detectives thereafter obtained Devi-ney’s consent to take a DNA sample. The detectives had Deviney read aloud a DNA consent form, which he signed. Part of the form stated: “I have not been promised anything and I have not been threatened in any manner. I am giving this consent.” The detectives then took buccal swabs from Deviney’s mouth and left the room. At this time, the interrogation had lasted approximately an hour. When the detectives returned, the following exchange occurred:
DETECTIVE: ... Randall, we have the results of the investigation and it clearly shows you’re the person who killed Ms. Delores.
THE DEFENDANT: No. No. Hell no. I don’t see how you all see that.
The detectives briefly discussed their investigation, and that, based on the information and evidence they had gathered during it, they considered him a suspect. They also noted Deviney’s admission that someone she knew must have done it, and that they found his DNA, which was already in the system, on her. Deviney continued to deny involvement in the murder of Futrell. The following discussion then occurred:
THE DEFENDANT: How much better can I explain, I did not do this.
DETECTIVE: Listen, listen to me. That’s not the question. You did do it. Randall—
THE DEFENDANT: I’m done. I’m done.[5]
DETECTIVE: What does that mean?
THE DEFENDANT: I’m done.
DETECTIVE: What does that mean, I’m done ?
THE DEFENDANT: I’m done. I’m ready to go home and I did not do this and if I did do it, I want you all to show me that I did do it.
DETECTIVE: We told you, Randall.
THE DEFENDANT: I didn’t do it.
DETECTIVE: Why would your DNA be on her?
THE DEFENDANT: My DNA wasn’t on her.
DETECTIVE: Oh, it is. Little old lady.
DETECTIVE: ... You cared about this lady, Randall.
THE DEFENDANT: I’m done. I’m ready to go home. Can I leave?
DETECTIVE: No.
THE DEFENDANT: Why? I didn’t do this shit, you all.
DETECTIVE: You did. You did. Randall, you did. You murdered this lady.
THE DEFENDANT: No, I didn’t.
DETECTIVE: No, Randall, you sit.
DETECTIVE: You cannot go.
THE DEFENDANT: I didn’t kill this lady, you all.
DETECTIVE: You’re not leaving.
THE DEFENDANT: Yes, I am. I didn’t kill this lady. Why can’t I go? Why?
DETECTIVE: We’ll be back in just a minute.
THE DEFENDANT: I’m ready to go.
DETECTIVE: You’re not going. You’re not going.
*66 THE DEFENDANT: Why, sir?
[[Image here]]
DETECTIVE: Here’s — here’s why. You’re a suspect in a homicide investigation right now.
THE DEFENDANT: You all said I could leave when ever I wanted to.
DETECTIVE: That was before. Now we’re legally detaining you. Okay? You cannot leave. You’re not free to go. Okay? You have a seat and we’ll be back in to talk with you in a little bit.
THE DEFENDANT: Can I talk to my girlfriend?
DETECTIVE: No. You are a suspect in a homicide. Okay. You cannot go. Still under investigation. Do you have anything else in you — on you? Give me your watch, too. Your bracelet.
THE DEFENDANT: I think I’ll hold onto this until I get over there.
DETECTIVE: It’s not an option anymore. You’re in our custody.
[[Image here]]
THE DEFENDANT:. I didn’t do nothing. DETECTIVE: Yes, you did.
DETECTIVE: Just have a seat and relax. We’ll be right back.
THE DEFENDANT: Can I go?
DETECTIVE: No.
THE DEFENDANT: Why?
DETECTIVE: I just explained it to you.
DETECTIVE: Listen, we can’t talk to you. Okay. We can’t talk to you. Okay. Randall, sit down.
THE DEFENDANT: Why can’t I leave?
DETECTIVE: Sit down. You’re being detained.
THE DEFENDANT: For what?
DETECTIVE: A murder investigation.
THE DEFENDANT: I did not kill this lady.
DETECTIVE: Sit down, bro. You’re not going anywhere.
DETECTIVE: If you force us to sit you down, we’ll have to do that. Okay. I don’t want to do that.
DETECTIVE: You don’t want to do that.
DETECTIVE: So have a seat. We’ll be right back with you.
DETECTIVE: Please have a seat, Randall. Thank you.
(Emphasis added.)
The DVD video of this interrogation reveals that, during the above-quoted segment of the interview, Deviney stood out of his chair and attempted to leave. At that moment, the detectives stood in front of Deviney and informed him that he could not leave and that they were legally detaining him. The detectives then frisked Deviney, but did not physically restrain him in anyway. After the detectives legally detained and frisked Deviney, Deviney again tried to leave the interview room. The detectives once again informed him that he could not leave. When he asked why, they reiterated that they had now legally detained him as a suspect in a homicide investigation. Deviney became angry and more vehemently tried to leave the interview room. He did not touch the detectives. The detectives warned him that if he did not sit down, they would physically restrain him. Deviney then proceeded back to his chair without physical restraint (although it appears that one of the detectives placed his hand out to stop Deviney and, while doing so, softly touched Deviney’s chest). The detectives did not re-administer Miranda warnings.
Subsequent to this exchange, Deviney confessed to the murder of Futrell, stating that he did not remember the night, and that, “When I was there, it wasn’t me there. I mean I was there, but it just *67 wasn’t me.” Deviney stated that Futrell voluntarily admitted him to her home, she did not catch him taking money from her purse, and that he “would never steal from her.” Deviney stated that he went to her home “to see how she was doing and all of a sudden she asked me how everything was going, I told her I was having problems and she wants to bring up my child life, I think that’s what it was.” Deviney told the officers that, “I lost my mind. That’s all.” When asked what triggered it, Deviney responded, “I can’t stand when somebody talks about my childhood.” The following interaction then occurred:
DETECTIVE: Did she fight you?
THE DEFENDANT: No.
[[Image here]]
DETECTIVE: ... What happened once she upset you?
THE DEFENDANT: I had walked out back, she had followed me, I was looking at her pond, and all the things I had done for her and — she’s—she knows how I felt about my damn childhood.
[[Image here]]
THE DEFENDANT: She’s sitting down on the — on the edge of the pond and I had cut her throat and she fell to the ground.
DETECTIVE: What did you cut her throat with? It’s okay.
THE DEFENDANT: Fish filleting knife.
DETECTIVE: A fish filleting knife? Where did you get the knife?
THE DEFENDANT: I always had it when I was out. It was in my tackle box.
DETECTIVE: You kept it with you?
THE DEFENDANT: Yes, sir.
DETECTIVE: What did you do with that knife?
THE DEFENDANT: It’s in the yard somewhere I think. I didn’t take it with me. When I cut her throat she just bent over the ground.
DETECTIVE: How did she get inside?
THE DEFENDANT: I drug her in.
DETECTIVE: How did her clothes get off?
THE DEFENDANT: I had took them off.
DETECTIVE: What did you take her clothes off for?
THE DEFENDANT: I don’t know. Try to make it look like somebody else did it. I didn’t do nothing to her, though.
DETECTIVE: I know you didn’t. We know you didn’t. We tested and checked for all that and you didn’t.
THE DEFENDANT: I didn’t touch her at all.
DETECTIVE: No, you didn’t. No, you didn’t. It’s okay. It’s all right.
THE DEFENDANT: And when she fell on the ground she was screaming for help and I didn’t believe that, that she could do that. So I went to go stab her with the knife and it broke and it went somewhere in the yard. I couldn’t find it.
Deviney stated that he did not remember if Futrell had grabbed him, and he had no scratch marks on him from the crime. During the attack, he explained that he did not wear gloves, and that blood did not spill on him. He did not call 911 and he was not sure if Futrell made the call (during trial, the State contended that Futrell may have dialed 911 in an attempt to receive help). After moving Futrell’s body inside, he left the townhome through the front door.
The detectives left the interview room and Deviney’s mother entered. The following conversation then occurred:
*68 MOTHER: ... I don’t understand why you would do that to Ms. Delores.
THE DEFENDANT: I don’t know, Mom. I feel bad as it is now. I don’t know. I tried to tell you.
MOTHER: Did you really?
THE DEFENDANT: Yeah.
MOTHER: When did you try to tell me, Bubba?
THE DEFENDANT: I tried to tell you, mama, but I just couldn’t (inaudible). MOTHER: I’m so sorry Randall.
[[Image here]]
THE DEFENDANT: ... I’m surprised they let me see you.
MOTHER: I wanted to because I didn’t believe them.
THE DEFENDANT: I thought I was able to get away.
[[Image here]]
MOTHER: What was Ms. Delores saying that upset you?
THE DEFENDANT: Mom, you know how I am about my childhood. She brought my shit up. I know my shit was bad. Then she started about my (inaudible) I wish they would have kept their mouth shut about what happened.
MOTHER: No, you shouldn’t have done that, Bubba.
THE DEFENDANT: I know, mom. That shit sent me over the edge, man. I tried to tell you and Ronnie.
[[Image here]]
MOTHER: Why would you take her clothes off of her?
THE DEFENDANT: To throw the suspicion off, mom. I didn’t know if anybody seen me walking out there or not.
[[Image here]]
THE DEFENDANT: ... I guess she scratched me somewhere. That’s why I threw her in the pond. Don’t even talk about that, mama.
[[Image here]]
MOTHER: If it was so bloody and stuff, I don’t understand how you didn’t get blood all over you. You didn’t come home with blood all over you.
(Knocking on door.)
THE DEFENDANT: Yeah.
MOTHER: You did?
THE DEFENDANT: Shhhh.
The detectives thereafter formally arrested Deviney and a grand jury subsequently indicted him for the first-degree murder of Futrell. The State also charged him by information with the second-degree murder of Futrell. Before trial, Deviney moved to suppress his confession to the police. He alleged that the police obtained the confession after his unequivocal invocation of his right to remain silent, violating the privilege against self-incrimination guaranteed by both the United States and Florida Constitutions. The trial court denied that motion.
During Deviney’s trial, the jury heard the testimony of Futrell’s companion of thirty years, Hartwell Perkins. Both Perkins and Futrell lived together in New York and then moved to Jacksonville, Florida, to be closer to Futrell’s daughter. Perkins is semi-retired and works seasonally as a chef at a campground in Catskills, New York. On the night of the murder, he was in New York with the couple’s American Bulldog, Prince. Futrell did not accompany Perkins to New York because her multiple sclerosis made it difficult to travel. Perkins also took Prince with him because, due to Futrell’s weakness caused by her multiple sclerosis, she was incapable of handling him on her own. According to Perkins, Futrell had suffered from multiple sclerosis for about forty-five years. He stated that her condition progressively worsened in terms of her ability to move around. She could not keep her *69 balance, and a gentle touch would knock her over. In the period prior to the murder, she also started to have problems walking. According to Perkins, Futrell typically kept cash in the house, and she always had $40 or $50 in her wallet.
A few days after Futrell’s murder, Perkins held a vigil at the townhome. This was the first time the police allowed people inside the townhome after the murder. According to Perkins, quite a few neighbors attended, including Deviney. Devi-ney allegedly brought flowers and acted empathetic and concerned. He told Perkins that he thought very highly of Futrell. A neighbor of Futrell who attended the vigil described Deviney as acting very anxious to access the townhome. She described Deviney as having impolitely pushed his way into the home, and that he proceeded to the backyard, where he looked around for something. The neighbor also spoke with Deviney and his mother the day after the murder. According to the neighbor, Deviney said that he heard someone had sexually violated Futrell. This was the first time the neighbor heard such accusations. Another neighbor of Futrell encountered Deviney at the vigil. While inside of Futrell’s townhome, the neighbor stated that Deviney described where the police had collected evidence in Futrell’s backyard, e.g., blood spots in the backyard and on the fishpond.
The jury convicted Deviney of the first-degree murder of Futrell. The special verdict form the jury used offered two possible bases for a finding of first-degree murder: (1) premeditation; or (2) murder committed during the commission of a burglary and/or attempted burglary and/or attempted sexual battery. The jury individually checked both options.
During the penalty phase of Deviney’s trial, the State presented victim impact statements from Futrell’s two daughters and her older sister. The State also offered the testimony of a neighbor, who stated that Futrell’s multiple sclerosis progressively worsened. Over time, Futrell lost stamina, muscle mass, strength, and weight; she could no longer lift heavy objects; and she had difficulty walking and keeping her balance. Futrell’s weakened condition was exposed when she attempted to walk her dog, but would lose her balance and fall to the ground. Futrell also reduced her amount of yard work and spent more time inside her townhome.
The defense presented the testimony of Deviney’s stepmother. She testified that Deviney was in a special education program, and that he received a special high school diploma. Deviney earned the diploma by successfully completing a work-study, i.e., he was in school part of the day and participated in outside employment for the second part of the day.
The defense also presented the testimony of Deviney’s mother, Nancy Mullins. When Nancy and Michael Deviney (Devi-ney’s father) were first married, they lived in Arkansas. While in Arkansas, and before Deviney’s birth, Nancy and Michael had a son, Christopher, who died at the age of fifteen months. Nancy and Michael were subsequently convicted for the second-degree murder of Christopher. Both were sentenced to twenty years’ imprisonment. After five years’ imprisonment, Nancy and Michael were released and placed on parole.
Michael and Nancy reunited in Arkansas post-imprisonment, after which time they had Deviney and, a year later, his younger brother, Wendell. In 1991, the Deviney family moved to Florida. In 1992, Deviney received hospital treatment because he was stabbed in the side of his chest. At the time of the stabbing, Deviney was three-and-a-half years old and doctors *70 found coins, a paper clip, and a rubber band inside Deviney’s stomach.
According to Nancy, Deviney has a learning disability that has persisted .since he was young. When Deviney was four, Nancy enrolled him in a program called Child Find which helps children with speech and writing learning disabilities. According to Nancy, Deviney had trouble with verbal communication because “everything he did was backwards and upside down.” Nancy testified that she did not give Deviney medication because his father did not want him medicated, even though the medication would have helped Deviney.
In 1995, Nancy's relationship with Michael had gone awry. Nancy, Deviney, and Wendell lived in the same residence as Michael, even though Michael — while still married to Nancy — had his new girlfriend and her three children move in with them. In 1996, the police arrested Nancy for an alleged battery of Michael. According to Nancy, she and Michael had an argument which escalated into a violent brawl. De-viney was present during the incident. After this incident, Nancy moved out, taking Deviney and Wendell with her. She divorced Michael in 1997 and remarried in 1998.
After Nancy’s remarriage, Deviney moved in with his father, Michael. Devi-ney later moved back in with Nancy after the police arrested Michael for abusing Deviney and Wendell. In 2002, Deviney and Wendell again moved back in with Michael. Deviney was aware of his parents’ conflicts, as Nancy often spoke with him about the violence. When Deviney was seventeen (he was nineteen at the time of the murder), he was prescribed Zoloft. According to Nancy, it seemed to subdue his erratic behavior. Nancy testified that on the day of the murder, Devi-ney appeared upset because his father was saying “some bad stuff’ about her to him.
Deviney’s father, Michael, also testified. Michael explained that he moved his family to Florida with the hope that it would improve his marriage, but this did not happen. He described an incident when Nancy hit him in the face with a glass of tea, which permanently scarred him. De-viney was present during this incident.
According to Michael, Deviney had early and persistent learning problems in school. He had problems focusing on tasks and was reading disabled. Michael testified that Deviney was prescribed medication while in kindergarten, but that he was taken off the medication due to Nancy’s objections. When Deviney was fifteen, he ánd his brother Wendell had an altercation in which Deviney was hit on the head with a baseball bat. According to Michael, in 2002, Deviney was prescribed fifty milligrams of Zoloft to help foster self-control. Michael believed that the medication helped Deviney stay focused and control his mood swings. Deviney had trouble with academics, but ultimately qualified for graduation by proving he could succeed in employment outside of school.
The jury recommended a sentence of death by a 10-2 vote. During the Spencer'[6] hearing, the defense presented Devi-ney’s prison records which contained disciplinary reports. According to the defense, during those incidents, Deviney was not the aggressor. The defense also raised Deviney’s troubled and violent childhood, his lack of parental supervision, his unstable living situation, and his documented learning disability that was first noted in kindergarten and persisted throughout high school (as evidence by his “special diploma”). Defense counsel referred to Deviney’s alleged remorse for the crime as *71 evidenced during the police interrogation when he began to cry and in his sorrowful demeanor with his mother.
In the sentencing order, the trial court concluded that the State had proven beyond a reasonable doubt the following three aggravating circumstances, and it afforded each great weight: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary, or an attempt to commit a burglary, or an attempt to commit a sexual battery; (2) the capital felony was especially heinous, atrocious, or cruel; and (3) the victim of the capital felony was particularly vulnerable due to advanced age or disability-
The trial court instructed the jury on the following statutory mitigating circumstances: (1) the age of the defendant at the time of the crime; and (2) the existence of any other factors in the defendant’s background that would mitigate against the imposition of the death penalty. The trial court found that the defense proved the mitigator with regard to Devi-ne/s age and gave it moderate weight in determining the appropriateness of Devi-ne/s sentence. The trial court found that the defense presented no evidence to support any other statutory mitigator.
The trial court found that the Deviney proved the following eight nonstatutory mitigators and assigned them the following weight: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (slight weight); (2) the defendant provided information that led to the resolution of the case (slight weight); (3) the defendant’s mother assisted law enforcement with the knowledge and cooperation of the defendant {no weight)-, (4) defendant had a deprived childhood {moderate weight); (5) the defendant has many positive qualities, including skills as a landscaper, he performs kind deeds for others, he shares love and support with his family, and he has artistic skills {some weight); (6) the defendant maintained gainful employment {slight weight); (7) the defendant is remorseful {slight weight); and (8) the defendant is amenable to rehabilitation and a productive life in prison {slight weight).
After considering and weighing the established aggravating and mitigating circumstances, the trial court found that the aggravating circumstances in this case far outweighed the mitigating circumstances. It thereafter agreed with the jury’s recommendation and imposed a sentence of death upon Deviney. This direct appeal followed.
On appeal, Deviney contends that: (1) the trial court erred when it denied his motion to suppress his confession because, during his interrogation and before he confessed to the murder of Futrell, Deviney invoked his right to remain silent; (2) the trial court improperly found the heinous, atrocious, or cruel aggravator; (3) the trial court improperly found the aggravator that the victim was particularly vulnerable due to advanced age or disability; (4) the trial court erred when it denied Deviney’s motion for judgment of acquittal with regard to the charge of felony murder with an underlying felony of attempted sexual battery, and when it instructed the jury as to' the aggravator of the commission of a capital felony while engaged in the commission of an attempted sexual battery; (5) the trial court’s imposition of the death penalty was disproportionate; (6) the State made improper comments during the guilt and penalty phase closing arguments that cumulatively constituted fundamental error; (7).the trial court committed reversible error when it did not provide a jury instruction on the nonstatutory mitigator that the defendant committed the capital *72 felony while under the influence of extreme mental and emotional disturbance; and (8) Florida’s capital punishment scheme is unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
We have reviewed and rejected the majority of issues Deviney raised on appeal. We conclude that resolution of the Miranda claim is determinative of this cause, and therefore, we address only that issue. Based on the totality of the circumstances, we conclude that the police did not scrupulously honor Deviney’s invocation of his right to remain silent, that there was not competent, substantial evidence supporting the trial court’s finding that Deviney’s confession was voluntary, and that the State has failed to establish that this error was harmless beyond a reasonable doubt. We, therefore, reverse and remand for a new trial.
ANALYSIS
Standard of Review
This Court independently reviews mixed questions of law and fact that arise within the context of the Fifth Amendment of the United States Constitution and, by extension, article I, section 9, of the Florida Constitution. See Cuervo v. State, 967 So.2d 155, 160 (Fla.2007). This Court accords a presumption of correctness to the findings of fact by the trial court and will overturn those findings only if the trial court failed to support them with competent, substantial evidence. See id. However, this Court will conduct a de novo review of the trial court’s application of law to those facts. See id. The State also bears the burden to prove by a preponderance of the evidence that, given the totality of the circumstances, a confession was freely and voluntarily given by a defendant and, therefore, admissible. See id.
The United States Supreme Court has held that when a court assesses the totality of the circumstances and considers whether, given those circumstances, the will of a defendant has been overborne, it should take into account “both the characteristics of the accused and the details of the interrogation.” Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The factors a court may consider include the age and youth of the accused; the lack of education of the accused; the low intelligence of the accused; the duration of the detention; the lack of advice given to the accused with regard to his or her constitutional rights; the prolonged and repeated nature of questioning; and the use of physical punishment, such as the deprivation of food or sleep. See id.
Applicable Law
The Fifth Amendment of the United States Constitution and article I, section 9, of the Florida Constitution both provide a right against self-incrimination. See U.S. Const. Amend. V (stating that no person “shall be compelled in any criminal case to be a witness against himself’); art. I, § 9, Fla. Const. (“No person shall be ... compelled in any criminal matter to be a witness against oneself.”). Pursuant to the exclusionary rule, if police obtain statements from a defendant in violation of the right against self-incrimination, the State cannot use those statements against the defendant and the trial court must exclude them from trial. See Cuervo, 967 So.2d at 160.
In Miranda v. Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court discussed the importance of the privilege against self-incrimination. The Court provided that “the privilege has come rightfully to be recognized in part as an individu *73 al’s substantive right, a right to ... lead a private life, [which is] the hallmark of our democracy.” See id. (internal quotation marks omitted). The High Court then defined the “constitutional foundation” underlying the privilege against self-incrimination as “the respect a government— state or federal — must accord to the dignity and integrity of its citizens,” which includes respect for “the inviolability of the human personality.” Id. This respect necessitates “that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.” Id. Thus, the Court concluded that “the privilege is fulfilled only when the person is guaranteed the right ‘to remain silent unless he chooses to speak in the unfettered exercise of his own will.’ ” Id. (emphasis added) (quoting Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).
The High Court explained that the free will of a defendant is jeopardized when the defendant is “swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion.” Id. at 461, 86 S.Ct. 1602. The Court noted that “the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.” Id. The Court, in quoting the British and American history and decisional law in which the privilege against self-incrimination is rooted, stated that for an incriminating statement to be admissible in court, it must be demonstrated that the defendant made the statement voluntarily, and that the statement was not involuntary and the result of improper influences, but for which the defendant would have remained silent. See id. To combat the “inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely,” the Miranda Court concluded that procedural safeguards during in-custody interrogations of a suspect or an accused were necessary. See id. at 467, 86 S.Ct. 1602. The Court held that government agents must adequately and effectively advise the accused of his or her rights and “fully honor” those rights upon invocation. See id.
To protect the individual right against self incrimination, the High Court delineated a prophylactic rule that police must employ before the custodial interrogation of a suspect:
Prior to any. questioning, the person must be warned that he has a[l] right to remain silent, [2] that any statement he does make may be used as evidence against him, and [3] that he has a right to the presence of an attorney, [4] either retained or appointed.... [I]f the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.
Id. at 444-45, 86 S.Ct. 1602 (emphasis added). The Miranda warnings apply whenever a person is in the custody of the police and the police subject him or her to express questioning, or its functional equivalent, to a degree that the police should reasonably expect to elicit an incriminating response. See Cuervo, 967 So.2d at 161. A defendant is in custody for purposes of Miranda when a reasonable person under the circumstances would be *74 lieve that the police have curtailed his or her freedom to a degree associated with a formal arrest. See Ramirez v. State, 739 So.2d 568, 573 (Fla.1999). When determining whether a defendant is in custody, a court may consider whether the police informed the defendant that he or she was free to leave the place of questioning. See id. at 574.
The Miranda Court further explained the extent of the protections afforded by the right against self-incrimination and the aforementioned Miranda warnings, stating:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the in-teirogation must cease. At this point he has shown that he intends to exercise his- Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 (emphasis added; footnote omitted). The High Court emphasized that the purpose of Miranda warnings is to assure that the exercise of the right against self-incrimination is “scrupulously honored” by law enforcement. See id. at 478-79, 86 S.Ct. 1602.
Similarly, as interpreted by this Court, article I, section 9, of the Florida Constitution stands for the proposition that when a suspect, in any manner, indicates that he or she does not wish to engage in an interrogation with law enforcement, an interrogation must not start, or if it has begun, must cease immediately. See Traylor v. State, 596 So.2d 957, 966 (Fla.1992). Police fail to scrupulously hon- or a defendant’s invocation of the right to remain silent, and therefore violate that right, when, in the face of the invocation of that right, the police persistently and repeatedly engage in efforts to wear down a suspect’s resistance and make the suspect change his or her mind. See Michigan v. Mosley, 423 U.S. 96, 105-06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
Once the police have properly administered Miranda warnings to a suspect, and the suspect validly waives those rights, law enforcement need only cease questioning upon an unequivocal invocation to terminate the interrogation. See State v. Owen, 696 So.2d 715, 719 (Fla.1997) (Owen II); see also Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). If that request is equivocal or ambiguous, the police may continue questioning. See Owen II, 696 So.2d at 719. A suspect unequivocally invokes the right to remain silent if, with sufficient clarity, he or she expresses a desire to end questioning in such a manner that a reasonable officer under the circumstances would understand that the suspect has invoked his or her right to end questioning. See id. at 718. As provided in Miranda, when determining whether an individual has invoked his or her right to remain silent, an officer must consider “any manner ” in which the defendant may have invoked that right, Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 (emphasis added), meaning that there are no magic words a defendant must use to invoke that right. See Owen II, 696 So.2d at 719. Further, such an invocation may include not only the words of a defendant, but also his or her conduct. See Pierre v. State, 22 So.3d 759, 769 (Fla. 4th DCA 2009) (“Instead, Pierre’s conduct reflected an un *75 equivocal invocation of Pierre’s right to remain silent.” (emphasis added)); see also State v. Kasel, 488 N.W.2d 706, 707-09 (Iowa 1992).
Although recommended by this Court, police are not required to ask clarifying questions when a suspect equivocally invokes his or her right to remain silent. See Owen II, 696 So.2d at 719; see also Cuervo, 967 So.2d at 161-62. This Court has held that to require the police to ask clarifying questions in the face of an ambiguous invocation of the right to remain silent would pose too great an impediment on law enforcement’s efforts and ability to thwart crime and promote public safety. See Owen II, 696 So.2d at 719.
For example, in Cuervo, the police read the suspect his Miranda rights, after which they asked him: “Do you understand all of the rights I have just explained to you? Yes or no?” 967 So.2d at 162. The suspect responded in the affirmative. See id. The police then asked the suspect if he wished to talk with them and make a statement. See id. The suspect, who did not speak English, responded through a translator that, “I don’t want to declare anything.” Id. We held that this statement constituted a clear invocation of the suspect’s right to remain silent. See id. at 168.
In contrast, in the Owen case, this Court held that a suspect did not unequivocally invoke his right to remain silent. See Owen II, 696 So.2d at 720. There, the police questioned a suspect about his involvement in a crime. See Owen v. State, 560 So.2d 207, 210-11 (Fla.1990) (Owen I). After the police presented the suspect with evidence against him, the suspect appeared to acknowledge the conclusiveness of the State’s evidence. See id. The police then inquired about a relatively insignificant detail with regard to the evidence, to which the suspect responded, “I’d rather not talk about it.” Id. at 211. After the police urged him to clarify, he responded with inculpatory answers and questions of his own. See id. After more exchanges between the suspect and police, and a question on another relatively insignificant detail, the suspect responded with, “I don’t want to talk about it.” Id. This Court ultimately held that those statements were equivocal invocations of the defendant’s right to remain silent. See Owen II, 696 So.2d at 719-20. In a separate, subsequent case, this Court clarified that the statements in the Owen case were ambiguous because the police could have interpreted the statements to be a reference to specific questions about the crime or a request to end all questioning. See Almeida v. State, 737 So.2d 520, 523 (Fla.1999) (citing Owen II, 696 So.2d at 719).
In Pierre v. State, the Fourth District addressed a Miranda issue similar to that discussed in the Owen case. There, the defendant was convicted of first-degree felony murder and robbery and sentenced to life imprisonment. See 22 So.3d at 761. During an interrogation by the police, the defendant stated the following: “Did what, what are you talking, I didn’t take nothing. You tripping, man, I didn’t say nothing. I was nowhere near them guys. I wasn’t with nobody, I was with my cousin waiting on my baby momma, that’s where I was, 33rd and Kentucky. I’m not saying anymore.” Id. at 766. At this point, the defendant remained silent in the face of a detective’s attempt to continue questioning. See id. That detective eventually stopped the questioning and sat silently. See id. Nearly a minute later, another detective entered the interrogation room and, in an accusatory tone, reengaged the then-silent defendant. See id. at 766-67. The defendant defensively responded, which led to another forty-five minutes of questioning in which the defendant contin *76 ued to deny involvement in the crime. See id. at 767. During this discourse, the defendant sometimes sat silently as the detectives continued to question him. See id. The defendant would eventually make incriminating statements, after which he would again state, “I’m not talking anymore.” Id. (emphasis added). One of the detectives attempted another question after this statement, but the second ended the interrogation, stating that, “He said he didn’t want to talk anymore, man.” Id.
The Fourth District concluded that the defendant’s right to remain silent was not scrupulously honored because the defendant’s initial statement of “I’m not talking anymore,” followed by his silence for nearly a minute, constituted an unequivocal invocation of his right to end questioning. See id. at 771. The district court held that the detectives, by continuing to engage the defendant after this statement and silent conduct, failed to honor his right to end questioning and remain silent. See id.
We also note the decision of the Iowa Supreme Court in State v. Kasel, 488 N.W.2d 706 (Iowa 1992). We find the factual circumstances in that case persuasively similar to the case at hand. There, the police asked the defendant to come to the police station for questioning concerning a child-abuse investigation. See Kasel, 488 N.W.2d at 707-08. The defendant complied and, under her own volition, went to the police station for an interview. See id. The defendant was twenty-two years old and a high school graduate, but appeared to be a person of “limited abilities,” as she was enrolled in special education classes while in school. See id. at 708. At the onset of the interview, the police administered standard Miranda warnings and also told the defendant that she was free to leave. See id. The defendant gave the police her oral consent to speak with them, but she did not sign a written Miranda waiver form. See id. At one point during the interview, the police described to the defendant the allegations lodged against her. See id. The defendant responded by storming out of the room. See id. The police followed her down the hall; grabbed her arm; told her, “The rules have changed”; and returned her to the interrogation room. See id. The police continued the interrogation, but they did not re-administer the Miranda warnings. See id. The defendant subsequently confessed to the police. See id.
The Iowa Supreme Court first concluded that because the police told the defendant she was free to leave at the onset of the interview, the interview at that time was a noncustodial interrogation and the police officers did not need to administer Miranda warnings. See id. at 709 (stating that at the beginning of the interview, the police had not taken defendant into custody or deprived her of her freedom in anyway). However, once the defendant left the room and the police retrieved hen this triggered the police’s obligations under Miranda. See id. The court held that, at that point, the “status of the interrogation clearly shifted from noncustodial to custodial.” Id. at 708. The court concluded that the police were therefore obliged to either renew the Miranda warnings or honor the warnings previously given by ending the questioning, as the defendant’s departure from the interrogation room was an obvious invocation of her right to remain silent and end questioning. See id. The court held that because the police failed to “scrupulously honor” this invocation, the police violated the defendant’s right to remain silent and end questioning. See id. at 709.
This Case
At the time of Deviney’s interrogation, he was a nineteen-year-old, high school graduate of limited abilities. Deviney was *77 persistently learning disabled. While in school, he was enrolled in special education programs from kindergarten through high school. One such program was named Child Find, which is a program that helps children with speech and writing learning disabilities. The high school diploma he earned was a “special diploma,” meaning that he earned it by completing a special education program that included a work-study. The record indicates that he obtained employment in menial jobs after graduation.
At the onset of Deviney’s interview, the police informed him that he was not in custody, he was not under arrest, the door was unlocked, and he could leave at any time. He specifically asked whether he could “get up and leave whenever I want.” The detectives responded with, “You can leave. The door is unlocked.” The police then administered the Miranda warnings to Deviney. He read the warnings aloud from a consent form that he, along with the two detectives, signed. The detectives then began questioning him about Futrell’s murder. Deviney initially denied any knowledge with regard to who committed the murder. In response to questioning, he described his whereabouts on the night of the murder, averring that he spent it at or near his home. After approximately one hour of questioning, the detectives obtained Deviney’s consent to take a DNA sample and temporarily left the room.
Upon reentering, the detectives stated that they found his DNA on Futrell and that they believed he murdered her. At that moment, Deviney stated, “you all I’m ready to go.” Although Deviney seemed to express a desire to end questioning with this statement, he followed it with, “I don’t see how you all think I did that.” This subsequent statement by De-viney indicated that he wished to continue to engage the police about the case in an attempt to discover the evidence they had against him. Thus, by continuing to engage the police, Deviney’s initial invocation of his right to remain silent was equivocal, as a reasonable officer could believe that, under the circumstances, Deviney wanted to further engage the police and not end his interrogation.
The interrogation continued, and the police reiterated the strength of the DNA evidence they had against Deviney and implored him to confess. The following sequence then took place:
THE DEFENDANT: How much better can I explain, I did not do this.
DETECTIVE: Listen, listen to me. That’s not the question. You did do it. Randall—
THE DEFENDANT: I’m done. I’m done.
DETECTIVE: What does that mean? .
THE DEFENDANT: I’m done.
DETECTIVE: What does that mean. I’m done ?
THE DEFENDANT: I’m done. I’m ready to go home and I did not do this and if I did do it I want you all to show me that I did do it.
[[Image here]]
DETECTIVE: ... You cared about this lady, Randall.
THE DEFENDANT: I’m done. I’m ready to go home. Can I leave ?
DETECTIVE: No.
(emphasis added.)
Deviney’s six references to the fact that he was “done” with questioning represented an unequivocal invocation of his right to remain silent and end questioning. However, these unequivocal statements to end questioning are argued by the State to be equivocal because Devi-ney, after saying, “I’m done,” immediately stated, “[I]f I did do it, I want you all to *78 show me that I did do it.” More specifically, it is argued that a reasonable officer under the circumstances might perceive the subsequent “show me” statement to mean that Deviney did not want to end his interrogation, and that he wished to continue his dialogue with the police in an attempt to learn about the evidence they had against him.
However, Deviney dispelled any such argument by a subsequent reiteration of his wish to end the interrogation, “I’m done. I’m ready to go home. Can I leave?” (emphasis added.) After this statement, Deviney further indicated his desire to end questioning by standing and attempting to leave the interrogation room. This conduct demonstrated an obvious desire by Deviney to leave the interrogation room for the purpose of ending questioning. The detectives responded by informing him that he was no longer free to leave because they were now formally taking him into custody and legally detaining him for the murder of Futrell. The detectives subsequently frisked Deviney, after which he stood and, more vehemently, attempted to end questioning by leaving the interview room. The detectives, however, blocked his exit and, with the threat of physical restraint, compelled him to sit down and remain in his seat. The detectives did not re-administer Miranda warnings, nor did they cease questioning. Instead, the interrogation continued and, upon repeated questioning, Deviney confessed to Futrell’s murder to both the police and his mother.
Deviney’s “I’m done” statements, along with his attempts to end questioning by leaving the interrogation room, were a clear and vociferous invocation of his right to remain silent. However, upon formally taking Deviney into custody after his attempt to leave, the detectives failed to re-administer Miranda warnings. This was despite the fact that the interrogation had now become custodial, as the detectives informed Deviney for the first time that he was not free to leave, and that he was legally detained and in their custody. More importantly, the detectives failed to scrupulously honor the prior Miranda warnings they provided to Deviney at the onset of the interrogation by continuing to question him despite his six “I’m done” statements and conduct that clearly and convincingly evinced an unequivocal desire and intent to invoke his right to remain silent and end questioning. Instead, the detectives kept Deviney in the police interrogation room, which is innately intimidating, and persisted in their repeated attempts to elicit incriminating statements from Deviney — a young individual of limited abilities and education. This atmosphere of compulsion wore down the unfettered exercise of Deviney’s free will, leading him to confess to both the police and his mother.
Based on the totality of these circumstances, we conclude that these confessions were the product of compulsion and improper influences, but for which Deviney would have remained silent — the exact evil the Miranda decision and the warnings provided therein were designed to prevent. The totality of these circumstances also illustrate undue coercive pressure placed on Deviney by the police which caused a confession by Deviney that was not the product of his own free will. Therefore, based on the totality of the circumstances, there was not competent, substantial evidence supporting the trial court’s finding that Deviney’s confession was freely and voluntarily given.
Accordingly, given the totality of the circumstances and the communications and conduct by Deviney within those circumstances, we conclude that Deviney unequivocally invoked his right to remain silent and end the interrogation. By con *79 tinuing questioning after that unequivocal request, the detectives violated that right, causing an involuntary confession by Devi-ney.
Harmful Error
Miranda violations are subject to a harmless error analysis. See Caso v. State, 524 So.2d 422, 425 (Fla.1988). To affirm a conviction despite error at trial, the State must prove beyond a reasonable doubt that the error “did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Under DiGuilio, the focus of this Court is on the overall effect of the error on the trier of fact; not to substitute itself for the trier of fact and reweigh the evidence. See id. at 1139. Further, if a defendant’s statement resulted from a law enforcement officer’s illegal actions, that evidence is “fruit of the poisonous tree” and the trial court should exclude it from trial. See State v. Frierson, 926 So.2d 1139, 1143 (Fla.2006) (quoting Wong Sun v. U.S., 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).
In this case, Deviney’s confession to the police occurred after he invoked his right to remain silent. As a direct result of this confession, the police held Deviney in the interview room and permitted his mother to meet with him. During that meeting, which occurred almost immediately after Deviney confessed to the police, Deviney admitted to his mother that he murdered Futrell. Thus, there is a direct correlation between the police’s improper conduct and Deviney’s confessions to both the police and his mother. This deems both of those confessions fruit of the police’s illegal conduct.
Those confessions, as played in video format to the jury during trial, undoubtedly affected the jury’s verdict. More specifically, in Deviney’s confession to the police, he detailed how he cut Fut-rell’s throat, attempted to stab her again when she tried to scream, dragged her inside, and placed her in a sexually provocative position to dispel suspicion .that he committed the crime. Deviney again admitted to his mother that he killed Futrell. These statements were highly inculpatory and prejudicial, as they provided a complete and morbid picture of how Deviney brutally and callously engaged in the cruel murder of an elderly, disabled woman. Accordingly, there is a reasonable possibility that the statements contributed to the jury’s decision to convict Deviney of first-degree murder and recommend a sentence of death. Therefore, the trial court’s decision to allow the admission of Deviney’s confessions was not harmless. We accordingly reverse.
CONCLUSION
We conclude that the police violated De-viney’s right to remain silent. We hold that the trial court’s admission of Devi-ney’s confessions to both the police and his mother are harmful error. Therefore, we reverse Deviney’s conviction and sentence of death and remand for a new capital trial during which the trial court shall exclude Deviney’s confessions to the police and his mother.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion, in which QUINCE and PERRY, JJ., concur.
POLSTON, C.J., dissents with an opinion, in which CANADY, J., concurs.

. An unverified 911 call refers to a call to 911, but the dispatcher receives no response when he or she answers the call, and no answer is received when a call is returned to the phone number from which the 911 call originated.

. Aspirated blood has oxygen or oxygen bubbles mixed within it. This occurs when blood and air mix as they flow in or out of the body.

. Deviney’s DNA was placed into the CODIS system when he submitted a semen sample for DNA testing to the police in 2004.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The order of the trial court denying Devi-ney's motion to suppress states that at this point in the interrogation, Deviney stated: "I'm done. I'm going.” We have reviewed the DVD video of the interrogation, along with the portion of the trial transcript that covered the interrogation as it was viewed by the jury, and confirm that at this point in the interrogation, Deviney stated: "I'm done. I’m done.” Therefore, we conclude that the correct record of this part of the interrogation is: "I’m done. I’m done.”

. Spencer v. State, 615 So.2d 688 (Fla.1993).