WOLF, J.
Appellant .challenges his conviction for second-degree murder. He argues the trial court erred in denying his motions to suppress two separate statements made to the police. We determine both the April 27, 2012, and April 29, 2012, statements were obtained in violation of appellant’s right to remain silent. We also determine the State failed to establish that erroneous admission of these statements was harmless. We, therefore, reverse and remand for a new trial.

I. Factual and Procedural Background

Motion to Suppress Statements on April 27, 2012

Prior to trial, appellant filed a motion to suppress statements he made to officers on April 27, 2012. He argued the statements were given as a result of continued and persistent questioning and threats after he invoked his right to remain silent and his right to counsel.
A transcript of the interview appears in the record. The interview was conducted in Adele, Georgia, where appellant lived, regarding a shooting that took place during a drug deal in Jacksonville, Florida. Detectives Mirandized appellant and then confronted him with evidence of his guilt, including that the co-defendant Dexter Bridges had identified appellant as the shooter. Appellant initially denied being in Jacksonville and denied involvement in the drug deal or shooting. Then the following exchange took place:[1]
Det.: You wasn’t there?
Appellant: No and I am through with this interview because I am not—
Det.: You don’t want to talk to me?
Appellant: No, I am through with the interview because I am not fixing to sit here and—
Det.: Do you want to talk to me?
Appellant: I am not fixing to sit here and let you manipulate me to say something—
Det.: The truth, I can’t manipulate the truth man. Either I’ve got evidence or I don’t. Christina, Christina is lying to me?
Appellant: Man, I am not fixing to sit here and—
Det.: Do you want Christina to come back here and tell you—
Appellant: I am not fixing to sit here and let you, let you fellows make me say that I did something that I ain’t do?
Det.: Were you in Jacksonville on April 7th?
Appellant: I am through with this interview.
Det.: What are you saying? Do you not want to talk with us anymore? Because I will tell you what happens when you don’t want to talk with us anymore. You sit here. I go get, I call Jacksonville, get a warrant and I serve you with a murder warrant. Are you saying you don’t want to talk to me now anymore?
Appellant: I am saying, I ain’t saying I am not, I don’t want to talk to you. What are we talking about?
Det.: Alright. I am about to charge you with murder. You won’t leave here without being charged with murder.
Appellant: Why?
Det.: Because I have all of this against you.
Appellant: Right.
*570 Det.: I have evidence against you.
Appellant: You have evidence against me? How you got evidence against me?
[[Image here]]
Det.: I got two witnesses saying you drove to Jacksonville. Three, two witnesses saying you drove to Jacksonville.
Appellant: I drove to Jacksonville on April 7th.
Det.: If you want to talk to me knock on the door. I am going to go type up your warrant. You are under arrest. You have already been read your rights for murder and we will probably get a grand jury indictment for first degree murder once you are back in Jacksonville.
Appellant: I am saying. But how you going to—
Det.: Knock on the door if you want to talk to me.
Appellant: I am trying to talk to you now.
Det.: Knock on the door when you want to tell me the truth.
Appellant: I am trying to talk to you now. I am trying to talk to you now.
Det.: Have a seat. Are we going to play this I wasn’t in Jacksonville game, because I am not going to play that. If you say I am not in Jacksonville I am walking out. I am done with it. I will tell you I don’t want to talk to you no more.
Other Det.: If you want that, just let us know and we will just walk right back out and there ain’t no coming back.
Appellant: Inaudible.
Det.: He said you shot the dude over all this weed. Seven pounds man. You are about to take a ride and act like you are going to bone up with me like I don’t know my job.
Appellant: I am saying I ain’t trying, I ain’t trying to bow up to you or nothing. I ain’t trying. I am just telling you.
Det.: You want to tell me you wasn’t in Jacksonville? Because I am ready to walk. I got a lot of shit to do on you man.
Appellant: You got a lot of shit to do on me?
[[Image here]]
Det.: Typing up your warrant, that’s a lot of time.
Appellant: For what?
Det.: For murder.
Other Det.: We explained that to you.
Det.: I got to go get a judge in Jacksonville to sign a warrant, fax it up here. Arrest you up here or put a detainer on you and get you extradited down in Jacksonville. So what are we going to do ? Are we going to talk about the truth, of [sic] are you going to give me some sort of bullshit about I wasn’t even there.
(Emphasis added).
Appellant then admitted to giving the co-defendant his phone. He stated the co-defendant said he needed to drive to Jacksonville to get his clothes because he was moving back to Georgia, and he asked to borrow appellant’s phone. The detective asked appellant if he was in Jacksonville on the day of the shooting, and he responded, “No.” The detective stated, “Come on man, we are done.” Appellant responded, “Can you listen to me.” Detectives then presented appellant with evidence of his guilt, including a statement from the co-defendant that appellant was the shooter. Appellant denied being the shooter or knowing anything about the incident. The detectives stated, “Okay, thank you, we are done. Have a nice *571 life.:.. Tell us the truth and we — Appellant responded, “Can you come talk to me?” Appellant continued denying knowledge of the incident. The detective stated, “If you want to sit here and try and mold a story, I am done dude. I got a lot of work to do.” The detective left. Appellant immediately began banging, and the detective returned. Appellant continued denying culpability. The detective stated he was “done” with the interview, explaining, “You are going to be arrested for murder. .. .Dude, I’ve got to write a warrant on you man.” (Emphasis added). Appellant responded, “Come here man... .Come in.”
Appellant agreed to speak without a lawyer, but asked that his mother be brought in. The detective agreed, but only if appellant admitted to involvement in the incident. Appellant continued to deny involvement. The detective stated, “We are done.... I am going to lock this door. You are under arrest.” (Emphasis added). The detective left. Appellant knocked on the door. The detective returned. Appellant renewed his request for his mother and stated he did not want a lawyer. Then the detective asked appellant if he saw a murder. Appellant did not answer, but again asked for his mother. The detective then handcuffed appellant and stated he was “under arrest.” The detective left. Appellant knocked and yelled through the door repeatedly, “I will talk.” The second detective, who was still in the room continued questioning appellant, who continued denying involvement. The second detective reminded appellant “you are under arrest” and left. Appellant knocked on the door three separate times, and a few minutes later the detectives returned. Appellant continued to request his mother. He also asked why he was under arrest. They did not answer him, but instead removed his handcuffs.
Appellant admitted to going to Jacksonville in his girlfriend’s daughter’s car, with the co-defendant, in order to get the co-defendant’s clothes from a motel where he had been staying. He stated the co-defendant left him at the motel and came, back a few minutes later, and they returned to Georgia. The detectives told appellant he was not telling the truth and they left. Appellant began vomiting. He knocked on the door. The detectives returned less than a minute later and asked, “Are you ready to talk and tell the truth man? Or are we going to go with that before we type that up? ” (Emphasis added). Appellant renewed his request for his mother. He began throwing up again. His mother was then brought in. After additional questioning, appellant admitted to being in the car when the co-defendant got out and shot the victim. He denied knowing in advance what the co-defendant intended to do, but he admitted knowing the co-defendant had conflict with someone and wanted to send a “message.”

Trial Court Order on April 27 Interview

The trial court entered an order granting the motion to suppress in part. The court found that when appellant repeatedly stated, “I am through with this interview,” he “invoked his right to remain silent with sufficient clarity such that questioning by the officers should have ceased.” Moreover, the court found that the detective made a threat when he responded, “I will tell you what happens when you don’t want to talk to us anymore. You sit here. I go get ... a warrant and I serve you with a murder warrant.” The court found that statement “may reasonably be construed as a threat” and thus “any subsequent statement was not freely and voluntarily made.”
However, the court noted that soon thereafter, the detective stated, “If you want to talk to me knock on the door. I *572 am going to go type up your warrant. You are under arrest. You have already been read your rights for murder....” (Emphasis added). The court reasoned after the detective told appellant he was under arrest, the possibility of arrest could no longer be a threat used to coerce a response to the questioning. The court also noted that the detective then attempted to cease questioning and told appellant to knock on the door if he wanted to talk, and appellant responded that “I am trying to talk to you now.” “Given [appellant’s] prior advisement of his Miranda rights and his invocation of his right to remain silent immediately prior to his request to continue communicating with the officers,” the court found appellant’s re-initiation of the conversation was voluntary. Thus, the court granted the motion to suppress any statements made by appellant during the brief period of time between when arrest was threatened and when he was first told he was under arrest, but the court denied the motion for statements after the arrest.

Motion to Suppress Statements on April 29, 2012

Appellant filed a second motion to suppress regarding statements made on April 29, 2012, during an interview with himself and his co-defendant. He alleged the detectives failed to cease questioning him when he repeatedly and unequivocally invoked his right to remain silent by, saying things like, “I ain’t talking to you,” “I want to go back to my cell,” “I just want my visitation,” and “May I leave, man?” He further argued he twice invoked his right to counsel: the first time was when he was alone with the co-defendant, whom he alleged was an agent of the State, and the second time was when the detectives were in the room. He conceded the detectives stopped questioning him after his second request for counsel; however, he asserted they failed to scrupulously honor that request because they left him in the interview room with the co-defendant, who was an agent of the State.
The transcript of the interview reflects the following. Two detectives entered the interview room and reminded appellant and the co-defendant that they were under arrest. They agreed they still understood their rights. The detectives then left the room and encouraged appellant to admit to the co-defendant that he identified the co-defendant as the shooter during his April 27 interview. While the detectives were gone, appellant told the co-defendant, “I ain’t talking no more until I get a lawyer.” The detectives later reentered the room and began questioning. Appellant did not answer the questions, but instead asked to go to the bathroom, and he was escorted out of the room. While he was gone, the co-defendant stated he did not believe that appellant identified him as the shooter and asked to see the videotape of appellant’s interview. Appellant returned from the bathroom, and one detective stated to appellant:
Det.: Okay, look at me and be clear. He [the co-defendant] don’t believe me what I just told him. When we talked to you the other day with your mama, please look at me, give me respect, I am giving respect.
Appellant: Inaudible.
Det.: Huh?
Appellant: I ain’t talking to you.
Det.: Okay, let’s go get the video of him.
(Emphasis added). The detective explained he was about to play the portion of the video during which appellant named the co-defendant as the shooter, unless appellant would admit to the co-defendant that he identified him as the shooter. Appellant stated, “I want to go back to my cell.” The detective responded, “you don’t determine what goes on in here. Really, who do you think you are?” Appellant *573 stated, “I am asking man.” The detective told appellant “[y]ou are going to see this” video. The detective then played a portion of the video in which appellant stated the co-defendant was the shooter. The detectives continued questioning. Appellant stated, “I want my visitation man, got to see_I will go back to my cell and_ about.” The detective responded, “Well you know it don’t work that way. You know.” Appellant asked again, “I can’t do visitation?” The detective stated that appellant was in custody, that the interview would take “as long as you let it,” and that appellant was “dragging this out” by denying that he implicated the co-defendant when the video would clearly show that he did. The detectives continued playing the video of appellant’s interview. Appellant then asked, “May I leave man?” There was an inaudible response.
The first detective asked appellant, “[d]o you want to see his?”, apparently referring to the co-defendant’s videotaped interview. The second detective responded, “No, it’s not finished yet. You going to show how you did it.” After the video stopped, appellant stated he identified the co-defendant as the shooter because appellant’s girlfriend said the police threatened to prosecute her unléss appellant talked, and because his mother told him the co-defendant had already identified appellant as the shooter. Appellant then stated, “I don’t got nothing else to say before I get a lawyer.” The detectives immediately stopped the interview, stating, “You need a lawyer. All right ... We are done.”
Trial Court Order on April 29 Statements,
The trial court denied the motion to suppress the April 29 interview. The court found that when appellant stated, “I ain’t talking to you,” that was “merely a clarification of an inaudible comment the detective asked him to repeat by saying, ‘huh?’ ” “Within context,” the court found that statement “merely means that the inaudible comment made by [appellant] was not initially directed to the Detective.” Further; the court found appellant’s requests to return to his cell or to go to visitation were “a mere expression that he would prefer to be someplace else and is not an unequivocal invocation of his right to remain silent.” Similarly, the court found appellant’s statement that he did not want to watch, the video of Bridges’ interrogation was a “mere expression of his desire to forego a proffered video view rather than an unequivocal invocation of his right to remain silent.”[2]

II. Analysis

Standard of Review

“ ‘The ruling of the trial court on a motion to suppress comes to us clothed with a presumption of correctness and we must interpret the evidence and reasonable inference and deductions in a manner most favorable to sustaining the trial court’s ruling.’ ” Johnson v. State, 608 So.2d 4, 9 (Fla.1992) (quoting Owen v. State, 560 So.2d 207, 211 (Fla.1990)). The standard of review for the trial court’s factual findings is whether competent substantial evidence exists to support the trial court’s findings. To the contrary, a de novo standard of review is applied to findings of law. Delhall v. State, 95 So.3d 134, 150 (Fla.2012). A ruling on a motion to suppress is reviewed for harmless error. Amparo v. State, 818 So.2d 565 (Fla. 2d DCA 2002).

General Rule as to Voluntariness

In Deviney v. State, 112 So.3d 57, 74 (Fla.2013), the supreme court determined *574 that the Fifth Amendment of the United States Constitution and article I, section 9 of the Florida Constitution stand for the proposition that if a suspect “in any manner, indicates that he or she does not wish to engage in an interrogation with law enforcement ... if it has begun, must cease immediately.”
While a suspect’s invocation of the right to remain silent must be unequivocal and unambiguous, there are no magic words that must be used. State v. Owen, 696 So.2d 715, 719 (Fla.1997).
A suspect unequivocally invokes the right to remain silent if, with sufficient clarity, he or she expresses a desire to end questioning in such a manner that a reasonable officer under the circumstances would understand that the suspect has invoked his or her right to end questioning.
Deviney, 112 So.3d at 74 (citing Owen, 696 So.2d at 718).

April 27, 2012 Statement

Appellant argues the court correctly held that he unequivocally invoked his right to remain silent, and that the detective responded by threatening him with arrest; thus, appellant’s subsequent statements were not voluntary. However, he argues the court erred as a matter of law in concluding that his subsequent re-initiation of the conversation when the detective left the room was voluntary. He argues his re-initiation was not voluntary, but instead was the result of the coercive police tactic of persisting to threaten him with an arrest warrant if he did not talk. We agree.
It is well-established that “[a]fter a suspect invokes his or her Miranda rights, police officers are prohibited from engaging in words or actions that the officers ‘should know are reasonably likely to elicit an incriminating response from the suspect.’ ” Cuervo v. State, 967 So.2d 155, 164 (Fla.2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). The Cuervo court found officers “engaged in conduct they could reasonably anticipate would elicit an incriminating response” when the suspect stated he did not want to talk, but the officer stated “ ‘now would be your opportunity if you wish to speak and explain your side of the story, your version of what happened.’ ” Id. at 164.
Stated similarly, “[p]olice fail to scrupulously honor a defendant’s invocation of the right to remain silent ... when, in the face of the invocation of that right, the police persistently and repeatedly engage in efforts to wear down a suspect’s resistance and make the suspect change his or her mind.” Deviney, 112 So.3d at 74. The Deviney court found detectives did not scrupulously honor a suspect’s unequivocal invocation of his right to remain silent when they responded by taking him into formal custody without re-administering his Miranda rights, “kept [the suspect] in the police interrogation room, which is innately intimidating, and persisted in their repeated attempts to elicit incriminating statements.” Id. at 78.
Appellant argues that Calder v. State, 133 So.3d 1025 (Fla. 4th DCA 2014), is factually analogous to the case at hand. In Calder, the suspect invoked his right to counsel. Id. at 1028. The officer stated that if the suspect invoked his right to counsel, “I’m not gonna be able to get your side of the story and I’m not gonna be able to present your side of the story to the State Attorney’s office.” Id. The suspect stated he would be more comfortable obtaining counsel. Id. The officer repeatedly asked him if he wanted counsel, warning him that he could not talk to the suspect anymore if he wanted a lawyer present.
*575 The suspect repeatedly requested counsel. Id. The officer left but told the suspect to knock on the door if he changed his mind, stating:
“if you say ... it really would make me feel better if I got the opportunity to give my side of the story, talk about what happened.... I know that it’s very difficult for you and it’s going to be tough for you to sleep because the bottom line is you been through a tough situation and nobody wants to be in your shoes ... one of the things that makes somebody feel a lot better is if they get the opportunity to get things off of their chest....
Id. at 1028-29. After the officer left, the suspect cried for several minutes and then asked to speak to the officer. Id. at 1029. The officer then had the suspect sign a Miranda waiver, and he ultimately confessed. Id.
The trial court found the officer ceased questioning when the suspect invoked his right to counsel, and the suspect’s re-initiation of the conversation was voluntary. Id. However, the Calder court reversed, finding the “substance of the entire transaction confirmed that Calder did not voluntarily initiate the further conversation with police, and that his action in requesting the detective was merely the delayed product of the coercive police conduct.” Id. at 1032-83. The court found the officer’s statements “were designed to induce [the suspect] to reinitiate the communication without a lawyer.” Id. at 1033. The court found this “ploy” worked, “bringing Calder to tears and prompting him to ask to speak to the detective only a few minutes after the first interrogation had ended.” Id. Although recognizing it was bound by the trial court’s findings of fact, Calder found it was “not required to defer to the trial court’s conclusions regarding voluntariness. This is a question of law subject to de novo review.” Id.
The Calder court relied in part on a case out of the Ninth Circuit in which a suspect invoked his right to counsel, but then the officer told him it “ ‘might be worse’ ” if he talked to an attorney. Id. at 1032 (quoting Collazo v. Estelle, 940 F.2d 411, 414 (9th Cir.1991)). Three hours later, the suspect “ ‘changed his mind’ ” and spoke with police. Collazo, 940 F.2d at 414. The Ninth Circuit found that in viewing the entire transaction, the suspect did not voluntarily initiate further conversation, but instead the suspect’s request to talk was a “direct product” of coercive police conduct. Id. at 422.
Appellant also relies on Moss v. State, 60 So.3d 540 (Fla. 4th DCA 2011), in which the Fourth District similarly held a suspect’s re-initiation was involuntary. In Moss, after a detective read the suspect his Miranda rights, the suspect stated, “I want a lawyer.” Id. at 542. The detective responded, “Before you talk to me?” He stated, “Yes.” The detective stated, “Okay. So that means, if you request to talk to a lawyer before you talk to me, then we won’t be able to talk about what happened in this incident.... ‘Cause I don’t have a lawyer here for you. Do you understand what I’m saying?” Id. The suspect stated he understood, and the interrogation continued. Id. The Fourth District found the detective’s “continued conversation was a strategy to ‘wear down [Moss’s] resistance and make him change his mind’ about talking with the detective before, consulting a-lawyer.” Id. at- 544 (quoting Black v. State, 59 So.3d 340, 346 (Fla. 4th DCA 2011)). Thus, the court found “the state has not met its ‘heavy burden’ to demonstrate that Moss knowingly and intelligently waived his privilege against self-incrimination and the right to counsel.” Id. *576 (quoting Youngblood v. State, 9.So.3d 717, 720 (Fla. 2d DCA 2009)).
Appellant is correct that here, as in Calder, the “substance of the entire transaction confirmed that [appellant] did not voluntarily initiate the further conversation with police, and that his action in requesting the detective was merely the delayed product of the coercive police conduct.” 133 So.3d at 1032-33. Here, the court reasoned appellant’s re-initiation of the conversation was voluntary because the threat of arrest was gone after the detective first told appellant he was “under arrest,” and “[g]iven [appellant’s] prior advisement of his Miranda rights and his invocation of his right to remain silent immediately prior to his request to continue communicating,” his reinitiation was voluntary. Although this court is bound by the trial court’s factual findings if they are supported by the record, it is “not required to defer to the trial court’s conclusions regarding voluntariness. This is a question of law subject to de novo review.” Calder, 133 So.3d at 1033.
Here, the record clearly supports the court’s finding that appellant unequivocally invoked his right to remain silent, and that the detectives’ threat of arrest if he would not confess was coercive. However, the record does not support the court’s finding that this threat ended when the detective first stated appellant was “under arrest.” The detective had already explained to appellant that he first had to obtain an arrest warrant, and the detectives repeatedly threatened appellant with an arrest warrant throughout the remainder of the interview.
Moreover, the court erred in concluding that appellant’s re-initiation was voluntary “[g]iven [appellant’s] prior advisement of his Miranda rights and his invocation of his right to remain silent immediately prior to his request to continue communicating with the officers.” Other courts have found these factors indicate re-initiation was involuntary. As noted in the Calder opinion, the supreme court found re-initiation is voluntary if the suspect “ ‘initiates further conversation, is reminded of his rights, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted.’ ” Calder, 133 So.3d at 1031 (quoting Welch v. State, 992 So.2d 206, 214 (Fla.2008) (emphasis added) (finding statements were admissible where the defendant reinitiated 45 minutes after invoking his rights, was reminded again of his Miranda rights, and then waived them “without pressure” from the officer)). Similarly, the supreme court in Deviney, 112 So.3d at 78, found officers failed to scrupulously honor a suspect’s invocation of his right to counsel when they responded by placing him into formal custody and continued questioning him without re-administering his Miranda rights. Here, appellant was not reminded of his right to remain silent any of the times he was told he was under arrest. Thus, we conclude as a matter of law that appellant’s re-initiation of the conversation was involuntary.[3]

*577
April 29, 2012 Statement

Appellant argues the trial court erred in denying his motion to suppress statements he made during the interview on April 29, 2012, because he unequivocally invoked his right to counsel and his right to remain silent, but the detectives failed to scrupulously honor those invocations. We agree with appellant concerning the invocation of his right to remain silent, but not his right' to counsel.
Appellant argues he unequivocally invoked his right to remain silent when he stated, “I ain’t talking to you... .1 want to go back to my cell_I am asking man.” He argues these statements were analogous to those in Deviney, in which the defendant stated during an interview, “I’m done. I’m done... .I’m done. I’m ready to go home. Can I leave?” Deviney, 112 So.3d at 77. The Deviney court found his “ ‘I’m done’ statements, along with his attempts to end questioning by leaving the interrogation room, were a clear and vociferous invocation of his right to remain silent.” Id. at 78. See also Pierre v. State, 22 So.3d 759, 766 (Fla. 4th DCA 2009) (finding defendant’s statement “I’m not saying anymore” was an unequivocal invocation of the right to remain silent); Smith v. State, 915 So.2d 692, 693 (Fla. 3d DCA 2005) (finding defendant’s statement during interrogation that he had “nothing to say” was an unequivocal invocation of his right to remain silent).
Instead of scrupulously honoring the invocation of his right to remain silent, appellant argues the detectives insisted on playing a video recording of the co-defendant’s interview, to which appellant protested. After a portion of the video was played, he notes he asked for visitation, or to go back to his cell, but the detective continued playing the video. Soon thereafter appellant asked, “May I leave man?” However, appellant asserts the detective stated in response, “No, it’s not finished yet. You going to show how you did it.” Appellant argues that statement was intended to elicit an incriminating response.
The trial court found the first statement, “I ain’t talking to you,” was not an invocation of the right to remain silent. Instead in context, it was “merely a clarification of an inaudible comment the detective asked him to repeat by saying, ‘huh?’ ” The record supports this conclusion. The transcript reflects that appellant said something inaudible, the detective asked, “Huh?”, and appellant responded, “I ain’t talking to you.” There were two other men in the room in addition to the detective — a second detective and the co-defendant. The record supports the court’s conclusion that in context, appellant was merely clarifying that his inaudible comment was not directed at the first detective.
The court also found appellant’s requests for visitation and to return to his cell were “a mere expression that he would prefer to be someplace else and is not an unequivocal invocation of his right to remain silent.” Taken in context, we cannot agree with the trial judge.
The case at hand is materially indistinguishable from Deviney, 112 So.3d 57. Deviney was not under arrest or in custody. During the interview, he repeatedly stated he was “done,” and then he stated, “I’m done. I’m ready to go home. Can I leave?”, and then stood up and attempted to leave the interrogation room. Id. at 77. *578 The court found this “conduct demonstrated an obvious desire by Deviney to leave the interrogation room for the purpose of ending questioning.” Id. at 78.
In Deviney, 112 So.3d at 76, the court specifically cited with approval to the Iowa Supreme Court’s decision State v. Kasel, 488 N.W.2d 706, 709 (Iowa 1992), in which the court found a suspect unequivocally invoked her right to remain silent when she left the interrogation room.
In the instant case, while appellant, who was in custody, obviously could not leave without permission, his repeated desires to return to his cell in context could only reasonably be interpreted as a desire not to be interviewed and as an invocation of his right to remain silent. Therefore, we find that appellant unequivocally invoked the right to remain silent, and the detectives violated that right by continuing questioning.
The trial court’s orders denying suppression of the statements of April 27 and April 29 constituted error. We find that error was not harmless here. Therefore, we REVERSE the judgment and sentence.
ROWE and OSTERHAUS, JJ., concur.

. Statements by appellant indicating his de- ' sire to end the interview are italicized. Statements made by detectives threatening an arrest or arrest warrant are underlined.

. The court made further findings concerning statements made to the co-defendant which are not pertinent to our disposition of this case.

. It is noted that Moss v. State, 60 So.3d 540 (Fla. 4th DCA 2011), and Calder v. State, 133 So.3d 1025 (Fla. 4th DCA 2014), involved suspects who invoked their right to counsel, whereas appellant invoked his right to remain silent. That distinction does not make a difference in determining whether the re-initiation of a conversation after invoking a Miranda right was voluntary. As noted above, "[ajfter a suspect invokes his or her Miranda rights, police officers are prohibited from” attempting to "elicit an incriminating response.’ ” Cuervo v. State, 967 So.2d 155, 164 (Fla.2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis added)). Further, "when an accused has invoked the right to silence or right to counsel, if the accused initi *577 ates further conversation, is reminded of his rights, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted.” Welch v. State, 992 So.2d 206, 214 (Fla.2008) (emphasis added). Thus, the analysis is the same regardless of which Miranda right is invoked.