# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D16-5447

_____

ANTHONY DELANE WASHINGTON,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Clay County.
John H. Skinner, Judge.

August 1, 2018

ROWE, J.

After a jury trial, Anthony Delane Washington was convicted of first-degree murder and burglary with an assault or battery. On direct appeal, he argues that his convictions and sentences should be vacated because the incriminating statements he made to the police should have been suppressed. We disagree and affirm.

## I. Facts

Washington was a suspect in the murder of Alphonso Doss because he was having an affair with Doss's wife. Washington was first interviewed by police nine days after the murder. A second interview was conducted six months later after Washington voluntarily drove himself to the police station. The interview

began around 10:17 p.m. and continued until the early morning hours of the following day.

Approximately twelve minutes after Washington entered the interrogation room and before any questioning began, the following exchange occurred between Washington and Detective Monroe:

MONROE: All right, you have the right to remain silent. If you understand that, just put, put your initials right there for me. All right. Uh, anything you say can and will be used against you in a court of law. If you understand that just put your, initials there for me. Uh, you have the Right to talk to a lawyer and to have them present with you while you're, being questioned. If you understand that put your

WASHINGTON: Do I need that?

MONROE: What's that?

WASHINGTON: Do I need him?

MONROE: A-a lawyer? I'm, I'm not a lawyer. I can't really tell you that stuff. Uh, if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. If you understand that put your initials there. Uh, you can decide at any time to exercise these Rights and not answer any questions or make any statements. All right. Lastly, I have carefully read and listened to the above information. I fully understand my Rights. If you understand that? Put your initials there for me. And if you could sign there if you agree to everything we just went, went over. I think there's a place to print, address and stuff in there.

Thirteen minutes later, Washington inquired again about his right to counsel:

2

WASHINGTON:  Yeah, I mean if you got something, do I need to call my lawyer, or call (inaudible) I mean at, if you got me as a suspect I mean.

MONROE:  Well listen, I can't, I can't give you legal advice, okay?  I can tell you right now that, we wanna hear, we wanna give you the opportunity to talk to us and that's why we're here.

WASHINGTON:  Okay.

The interrogation continued for over ninety minutes before the following exchange occurred between Washington and Detectives Monroe and Singletary:

WASHINGTON:  So will I walk outta here tonight?

MONROE:  Well, we don't know what you're gonna tell us Anthony.

SINGLETARY:  We won't know the answer to that.

MONROE:  Until you tell us.

SINGLETARY:  Until we even know what happened. Cause only you, how will we, how will we know that?

WASHINGTON:  Can I call my lawyer?

SINGLETARY:  We can't tell you no.

MONROE:  Sometimes, there comes a time, in your life Anthony where, you have to make a decision, all right? And you as a father know, with your children, that they're gonna have things come up in their life, and you being raised the way that you were, I know, that you want them to make the right decisions, to be honest, to be truthful, to be good, good hearted young men.  That's how we raise our, our children.  I have a son.  I would want to raise him the same way, all right?  Part of being a father, is not

3

only, giving the right example to your children, but setting the example.

WASHINGTON: Okay.

MONROE: So ten years from now, fifteen years from now, you need to be able to look at your kids in their face and say look, I did the right thing. I led by example. I told the truth.

WASHINGTON: Let's get this on the way. Um. He came in lit. I was sitting on the bed. We had, we exchanged words, uh, I told him what I thought.

Before Washington could proceed with his statement, the detectives were asked by their supervisors to exit the interrogation room for a few minutes. When they returned, Detective Monroe reminded Washington of his rights:

MONROE: All right Anthony, um, something I want to address with you, okay? Um, here's the deal, okay? A minute ago, all right, and the most important thing here is that we've, we've made a conscious decision, that you're gonna be a good father and you're gonna led by example, not by, doing as I do, you know, you know that whole saying where you know, you don't do it but you tell it you got something or someone else to do it.

WASHINGTON: Yeah.

MONROE: Okay, a minute ago, okay, you brought up talking to a lawyer. All right, we went over at the beginning of this whole thing, your – your Rights, okay?

WASHINGTON: Yeah.

MONROE: Now, I want you, I wanna ask you again, all right, you went over, you know your Rights, okay, but you also know what's, what you're about to tell us. Okay? Now, listen, we, if you want to call your lawyer, you can call your lawyer.

4

SINGLETARY:  Yeah, like I said, we can't tell you no.

MONROE:  Okay, but if you don't wanna call your lawyer, and you wanna continue to tell us what you're about to tell us, listen, man to man, you can do that.  And I will respect you from sitting over there and me sitting over here, because like I said, we both have kids.  We both have sons.  And we know what's, what's right and what's wrong.

After considering this statement for almost thirty seconds, Washington continued to speak to the detectives.

WASHINGTON:  Okay.

MONROE:  Okay? So,

WASHINGTON:  That what, that's what I wanna ask you, man to man, sitting here, am I walking out that door?

SINGLETARY:  Like I told you before, we don't know what you're gonna tell us.

MONROE:  Until you tell us.

SINGLETARY:  And, I told you, if you tell us something, that is not clear to us, and is a violation of law, we will confer with the State Attorney, before we make a decision on what we're gonna do.

WASHINGTON:  Tonight?

SINGLETARY:  Tonight.  Tonight.

Washington paused to consider this response.  Then, he proceeded to make incriminating statements about the circumstances surrounding Doss's murder.

Washington moved to suppress his statements, arguing that they were not freely and voluntarily given because the detectives ignored his repeated requests for counsel and downplayed the significance of the *Miranda* warnings. After considering argument from counsel and viewing the video recording of Washington's interrogation, the trial court found that there was no delay in the administration of Washington's rights and that there was no indication that he was intimidated, coerced, or deceived into waiving his rights. The court further found that Washington never clearly and unequivocally requested counsel during the interrogation. The trial court denied the motion to suppress and the case proceeded to trial.

A jury found Washington guilty of first-degree murder during the commission of a burglary and burglary with an assault or battery. Washington was sentenced to concurrent terms of life imprisonment and thirty years' imprisonment. This timely appeal follows.

## II. Standard of Review

A trial court's ruling on a motion to suppress is subject to a mixed standard of review. The court's factual findings will be affirmed if they are supported by competent, substantial evidence. *Scott v. State*, 151 So. 3d 567, 573 (Fla. 1st DCA 2014). The trial court's conclusions of law are reviewed de novo. *Id.*

## III. Analysis

It is well-settled that police officers must immediately stop an interrogation when a suspect clearly and unequivocally requests counsel at any time during a custodial interview. *Davis v. United States*, 512 U.S. 452, 458 (1994). Failure to do so requires suppression of any statements made after the suspect has invoked his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, the police are not required to stop an interview when a suspect makes an equivocal or ambiguous request for counsel. *State v. Carter*, 172 So. 3d 538, 540 (Fla. 5th DCA 2015). Statements such as "maybe I should talk to a lawyer" are not unequivocal requests for counsel. *Id.* These types of statements do not require the police to ask clarifying questions as long as the

6

suspect was properly advised of his rights. *Spivey v. State*, 45 So. 3d 51, 54 (Fla. 1st DCA 2010). "The suspect must 'articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.'" *Id.* (quoting *State v. Owen*, 696 So. 2d 715, 718 (Fla. 1997)). When determining whether a suspect's statement was an unequivocal request for counsel, a reviewing court must consider the totality of the circumstances. *Deviney v. State*, 112 So. 3d 57, 72 (Fla. 2013). Along with the suspect's words, the suspect's conduct may indicate an invocation of the right to remain silent. *Id.*

Often, a suspect will not invoke the right to counsel, but instead, will ask the interrogating officer questions about his rights. When "a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." *Almeida v. State*, 737 So. 2d 520, 525 (Fla. 1999). If the officer properly answers the question, the interrogation can resume – assuming the suspect does not invoke his rights. *Id.* The supreme court emphasized that law enforcement officers are not required to "act as legal advisors or personal counselors for suspects." *State v. Glatzmayer*, 789 So. 2d 297, 305 (Fla. 2001). "All that is required of interrogating officers . . . is that they be honest and fair when addressing a suspect's constitutional rights." *Id.*

Washington argues that his incriminating statements should have been suppressed because he made multiple unequivocal requests for counsel and the detectives did not provide simple and straightforward answers when he inquired about his rights. Washington identifies three portions of the interrogation in which he asserts he invoked his right to counsel, which we will address in turn.

## A. "Do I need that? / Do I need him?

At the beginning of the interview, Washington asked whether he was a suspect in the murder of Doss. Detective Monroe explained that he was trying to eliminate individuals as suspects and that Washington needed to fill out the waiver form before the interview could proceed. Washington was asked to initial each of

7

the statements if he understood them. Detective Monroe assured Washington that the use of the form did not mean that Washington was a suspect. When Detective Monroe read the statement informing Washington of his right to an attorney, Washington asked, "Do I need that?" and "Do I need him?"

Washington asserts that these questions invoked his right to counsel and that the interrogation should have stopped. But we find that these questions were not unequivocal requests for counsel. *See Walker v. State*, 957 So. 2d 560, 571-74 (Fla. 2007) (holding that suspect's statement, "I think I may need a lawyer," and question asking detectives whether he needed counsel were not unequivocal requests for counsel). Rather, these questions by Washington amounted to requests for advice about his rights. And Detective Monroe satisfied the requirements of *Almeida* and *Glatzmayer* by temporarily stopping the interrogation to explain to Washington that he was not an attorney and could not advise Washington about whether an attorney was needed. Washington did not invoke his right to counsel and indicated his continued willingness to talk to the detectives after being fully advised of his rights. The interview was properly continued.

## B. *"Do I need to call my lawyer?"*

Almost fifteen minutes after signing the waiver form, Washington asked if he was a suspect and inquired, "do I need to call my lawyer?" Detective Monroe informed Washington that he was not qualified to give legal advice and that he wanted to hear what Washington had to say. Although Washington again asserts that his right to counsel was invoked, we conclude that his question "do I need to call my lawyer?" was not an unequivocal request for counsel. *See Spivey*, 45 So. 3d at 55 (holding that the statement "I mean if I am being held and I'm being charged with something I need to be on the phone calling my lawyer" was not an unequivocal request for counsel). Rather, it was a prefatory question about his rights. *See State v. Hineline*, 159 So. 3d 293, 297-98 (Fla. 1st DCA 2015) (holding that the question "do you think I'm going to need a lawyer" was not an unequivocal request for counsel, but a prefatory question requiring a simple and straightforward response). Again, Detective Monroe satisfied the requirements of *Almeida* and *Glatzmayer* by informing

8

Washington that he could not provide legal advice.  Washington did not invoke his rights and indicated his continuing willingness to speak to detectives after being fully advised of his rights.  The interview was properly resumed.

## C.  *"Can I call my lawyer?"*

After ninety minutes of questioning, Washington asked whether he would be able to leave the police station that night if he told the detectives his story.  The detectives repeatedly declined Washington's request for them to guarantee that he would be able to leave the station; rather, they assured him that if there was any question regarding the legality of his actions they would contact the State Attorney's Office that night to resolve the issue.  Washington then asked, "Can I call my lawyer?" Detective Singletary responded, "We can't tell you no."  After pausing for ten seconds with no response from Washington, Detective Monroe suggested that Washington should consider how he could set a good example for his son by doing the right thing.

Then, when Washington began to make a statement about the night in question, the interview was stopped by the detectives' supervisor.  After two minutes, Detective Monroe resumed the interrogation and explained to Washington, "if you want to call your lawyer, you can call your lawyer."  Detective Singletary confirmed that they could not tell him not to call his lawyer.  Washington again asked about leaving the station, and the detectives repeated that they could not answer that question without knowing what Washington would tell them.  After consideration of these answers, Washington made the incriminating statements that were used against him at trial.

Whether the question "Can I call my lawyer?" unequivocally invokes the right to counsel depends on the context in which the suspect poses the question.  In some circumstances, courts have found the question to unequivocally invoke the right to counsel. *See United States v. de la Jara*, 973 F.2d 746, 750-51 (9th Cir. 1992) (finding the question was an unequivocal request for counsel where the interrogating officer told another officer that it sounded like the suspect had invoked his right to counsel because the suspect "had just asked to call his attorney"); *see also Kamyab v.*

9

*Uribe*, 2009 WL 1520022, *15-16 (C.D. Cal. May 29, 2009) (finding the question an unequivocal request for counsel without further explanation); *Laurito v. State*, 120 So. 3d 203, 204-06 (Fla. 5th DCA 2013) (finding that the question "Can I make a phone call so I can get a lawyer?" when asked immediately after an officer gave the *Miranda* warnings was an unequivocal request for counsel). In other circumstances, courts have held that the question "Can I call my lawyer?" does not invoke the right to counsel but is merely a prefatory question about the suspect's rights. *See Ford v. Hall*, 546 F.3d 1326, 1339 (11th Cir. 2008) (finding the question was ambiguous where the suspect had just been informed that the police believed he was responsible for the crime in question and the interrogating officer advised the suspect that he could call a lawyer); *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001) (finding the question was not unequivocal where the suspect had just asked if he could contact his girlfriend and officers could reasonably believe the suspect was merely inquiring about whether he had the right to call counsel); *United States v. Laughlin*, 2012 WL 3065404, *20-21 (N.D. Ga. July 6, 2012) (finding the question did not invoke the right to counsel where the interrogating officer's clarifying questions led the suspect to state that he was not finished talking to the police); *United States v. Brown*, 2006 WL 2314057, *16 (D. Minn. Aug. 9, 2006) (finding that the question did not invoke the right to counsel based on the suspect's answers to the clarifying questions asked by the detectives).

Here, considering the context surrounding the question, we conclude that Washington did not unequivocally invoke his right to counsel. The detectives had read the *Miranda* rights over ninety minutes before this point in the interrogation. The detectives had just described incriminating evidence they had against him when Washington asked if he was free to leave and if he was going to "walk outta here tonight." Immediately after asking those questions, Washington inquired, "Can I call my lawyer?" The question was reasonably interpreted by the detectives to be an inquiry by Washington about whether he *could* contact an attorney as opposed to expressing a desire to terminate the interview and speak with counsel at that precise moment.

In response, the detectives answered Washington's question simply and directly in compliance with the requirements of *Almeida* and *Glatzmayer*. The record, including the unredacted video recording of the interrogation, demonstrates that the detectives did not steamroll Washington, play good cop/bad cop, or talk over him in an effort to coerce his confession. *Cf. Ross v. State*, 45 So. 3d 403, 424-25 (Fla. 2010) (holding that a confession was involuntary when the police made the deliberate decision to delay the giving of the *Miranda* warnings until several hours into the custodial interrogation and the lengthy interrogation was conducted in a highly accusatory manner). The video recording of the interrogation shows that the detectives paused after answering Washington's questions to allow him to consider his rights. It was only after a long pause that Detective Monroe resumed the interrogation. Washington did not thereafter invoke his right to counsel and indicated his willingness to speak to the detectives after being fully advised of his rights.

Because Washington did not unequivocally invoke his right to counsel, and the detectives provided straightforward and simple answers to Washington's questions about his rights, we hold that the trial court properly denied Washington's motion to suppress.

AFFIRMED.

WETHERELL and JAY, JJ., concur.

—————————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

—————————————————

Andy Thomas, Public Defender, and Kathleen Stover, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Steven E. Woods, Assistant Attorney General, Tallahassee, for Appellee.

11