FIFTH DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

Case No. 5D2024-0989
LT Case No. 2023-CF-015342-A

_____

STATE OF FLORIDA,

Appellant,

v.

THOMAS MICHAEL PASTOR, JR.,

Appellee.

_____

On appeal from the Circuit Court for Brevard County.
Aaron Peacock, Acting Circuit Judge.

James Uthmeier, Attorney General, Tallahassee, and Alyssa
M. Williams, and Richard A. Pallas, Jr., Assistant Attorneys
General, Daytona Beach, for Appellant.

Geoffrey P. Golub, of Law Offices of Geoffrey P. Golub, P.A.,
Melbourne, for Appellee.

August 22, 2025

SOUD, J.

The State of Florida appeals the trial court's order granting
Appellee Thomas Pastor, Jr.'s motion to suppress his statements
because the statements were made after he invoked his right to
counsel. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const.; §
924.071, Fla. Stat.; Fla. R. App. P. 9.140(c)(1)(B). We reverse,

concluding Pastor did not unequivocally invoke his right to counsel prior to voluntarily talking with law enforcement officers. Further, even if, *arguendo*, Pastor invoked his right to counsel, he reinitiated conversation with the detectives, during which he made his statements. As such, the trial court's order suppressing Pastor's post-*Miranda*[1] statements was error.

I.

Pastor stands indicted by the Grand Jury sitting in Brevard County for the first-degree premeditated murder of Michael Akerberg. At the time of his arrest, Pastor was taken to the Palm Bay Police Department for questioning by two detectives. As customary, the approximately 45-minute interrogation was video recorded. Early on, the detectives read Pastor his *Miranda* rights and Pastor, a then-24-year-old recruiter who holds a bachelor's degree, acknowledged he understood his rights.

Immediately thereafter, the following five-minute exchange took place:

Detective: Having these rights in mind, do you wish to speak with me now?

Pastor: Um, Yeah.

. . . .

Detective: So, can you tell me what happened tonight?

Pastor: I can yes. Obviously, I know my rights. I do want a lawyer. I will answer questions. I do want to speak with you because I want the truth to be known. What happened tonight, I felt was just an act of self-defense. I didn't know what else to do just because I don't know this man who's in my house and he's getting angry, and he was trying to take the kids away out of the house. And my mom was like, no, don't do that. And I could just see this

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

incident going on. And so, I mean, that's kind of what spiraled, but.

Detective: So, we just want to get your clarification.

Pastor: Yeah.

Detective: Okay. He read you your rights?

Pastor: Yeah.

Detective: Okay. And you said you agreed to talk to us?

Pastor: Yeah, I do still want a lawyer and everything but,

Detective: Okay. So, are you saying that you'll talk to us now and then you'll talk to your lawyer later? Or are you saying, because we need to be clear what you're saying.

Pastor: Okay.

Detective: Okay. So, are you saying that you don't want to talk to us until you talk to a lawyer, or are you saying you will talk to us now and then talk to your lawyer later? I'm not understanding what you mean by that. Because he asked you, "knowing these rights will you talk to us." You said, "Yes." Okay. So, are you saying that you do agree to talk to us?

Pastor: Yes, but also yes to the lawyer if I can have one.

Detective: Okay. So, you're saying you don't want to talk to us unless you have a lawyer, is that what you're saying? Or are you saying you want to talk to us, but you also want a lawyer . . . later or something?

Pastor: Yeah.

Detective: Is that what you're saying? You want a lawyer later? You want to talk to your lawyer later? Because we're not bringing a lawyer in here right now.

Pastor: No, I know. I don't think that's . . .

Detective: So that's what I'm asking. I want to clarify what you're saying. So, are you agreeing to talk to us now without a lawyer? Is that what you're saying?

Pastor: I believe in the system, and I believe in the truth and the facts. But if it's easier to just wait for the lawyer just to ensure that, then I guess.

Detective: I mean this is totally your, we're trying to get a straight answer from you . . .

Pastor: Yeah, yeah.

Detective: Because . . . we're trying to be fair with you.

Pastor: Yeah, yeah.

Detective: And like he said, he does want to get your side of the story. You know, it's important.

Pastor: Yeah.

Detective: So, we need to know. The question is, will you talk to us now without a lawyer?

Pastor: Can I ask one question?

Detective: Sure.

Pastor: If I do want a lawyer, then what happens from there?

Detective(s): We will stop the interview. Stop the interview.

Pastor: and then I just wait back in there.

Detective(s): Yeah, yeah.

Pastor: But what would happen after that?

Detective: Well, we're still, like I said, we don't know what you're going to tell us. We have no idea what you're going to tell us.

Pastor: Mhm.

Detective: Okay. That's the purpose of us. That's why we wanted to talk to you.

Pastor: Mhm.

Detective: Because we wasn't there.

Pastor: Yeah.

Detective: Okay. So, at some point you will get assigned an attorney.

Pastor: Yes.

Detective: You will get one.

Pastor: Mhm.

Detective: Okay. But if you're telling us now that you don't want to talk to us,

Pastor: Mhm.

Detective: Are you saying you do want to talk to us? Because it looks like you want to give your side of the story, looks like you want to cooperate.

Pastor: Yea.

Detective: Okay, then we'll talk to you.

Pastor: Mhm.

Detective: Okay? But we won't go get a lawyer now and bring him in here. We're not doing that.

Pastor: No, no, no, no. I know, I understand that.

Detective: So, my question is, would you talk to us now? Do you want to talk to us now without your attorney? Without an attorney at this time?

Pastor: At this time, I'll go ahead and say no with that case and just wait for the attorney. But can I just ask one question? At what point would an attorney come? I know there's no guarantee, but what does that look like? I just don't know. If I want to get an attorney, how long would I have to wait for one to come here? Or would they come the first thing in the morning, or would it take days?

Detective: No, they won't come here. That's what we're trying to tell you is that this is our opportunity to have a conversation about what occurred and get your side of the story. If you want a lawyer, then we got to stop. Your rights are important and we're not going to violate them. So, if that's what you want, then we stop and you're going to go back in there. And ultimately you leave us to make assumptions.

Detective: Yeah, because we have already talked to some people, we talked to your mom, we talked to Sarah. You know, so.

Pastor: I'll talk to you. I will, yes.

Detective: Without an attorney at this point?

Pastor: Right now, without an attorney. Yes.

After more than twenty-six minutes of answering questions, when asked specifics about storage of the firearm at issue in this case, Pastor said, "[a]t this point, I think it's best that I wait for a lawyer." Detectives immediately ended their questioning.

Ultimately, Pastor filed his motion seeking to suppress all statements made after he purportedly invoked his right to counsel (together with any physical evidence obtained as a result of such statements). He argued the statements were obtained in violation of the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Florida Constitution. The trial court granted the motion.

The State's appeal followed.

6

## II.

We review a trial court's ruling on a motion to suppress under a mixed standard—the court's factual findings will be affirmed when supported by competent substantial evidence, while its conclusions of law are reviewed de novo. *See State v. Carter*, 172 So. 3d 538, 539–40 (Fla. 5th DCA 2015). However, when, as here, a factual determination rests in large part upon review of a transcript or an audio/video recording, the deference afforded the trial court's findings of fact may not apply with full force because the trial court does not enjoy any special vantage point not available to the appellate court. *See id.* at 540 (citing *Almeida v. State,* 737 So. 2d 520, 524 n.9 (Fla. 1999)).

Pastor's motion sought to suppress his statements based on both the Fifth Amendment and the Florida Constitution. The trial court ultimately suppressed Pastor's statements because, in its view, Pastor unequivocally invoked his right to counsel and did not reinitiate discussions with law enforcement; "rather law enforcement continued to try to clarify an unequivocal request that needed no clarification." In doing so, the trial court erred.

### A.

### 1.

The Fifth Amendment, applicable to the States through the Fourteenth Amendment,[2] guarantees, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Amend. V, U.S. Const. This Clause secures to a defendant the right "to refuse to testify against himself at a criminal trial in which he is a defendant and also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (internal quotation marks omitted). This right guaranteed by the Fifth Amendment also precludes introducing into evidence

---

[2] *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

at trial against a criminal defendant any out-of-court statement obtained by compulsion. *See id.*

In *Miranda,* the United States Supreme Court fashioned a "series of recommended 'procedural safeguards' . . . [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Davis v. United States*, 512 U.S. 452, 457 (1994) (quoting *Michigan v. Tucker,* 417 U.S. 433, 443–44 (1974)); *see also State v. Penna,* 385 So. 3d 595, 600 (Fla. 2024). The Supreme Court has repeatedly described the required *Miranda* warnings as "prophylactic." *See Vega*, 597 U.S. at 143 (citing numerous cases affirming the same principle). And while they are "constitutionally based . . . they are prophylactic rules nonetheless." *See id.* at 142 (citation and internal quotation marks omitted).[3]

Among these long-familiar *Miranda* rights, an accused involved in a custodial interrogation "has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis*, 512 U.S. at 457.[4] *See also Wilson v. State*, 274 So. 3d 549, 552 (Fla. 5th DCA 2019); *Belc v. State*, 404 So. 3d 618, 623 (Fla. 1st DCA 2025). If a suspect waives his right to counsel after being warned of his *Miranda* rights, "law enforcement officers are free to question him." *Davis*, 512 U.S. at 458. However, once the right to counsel is invoked, police questioning must cease and "[a defendant] is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates

---

[3] As Justice Alito noted, *Miranda* "stated quite clearly that the Constitution did not itself require adherence to any particular solution for the inherent compulsions of the interrogation process and that its decision in no way create[d] a constitutional straitjacket." *See id.* at 143 (internal quotation marks omitted).

[4] In *Davis*, the Court noted that one's Sixth Amendment right to counsel does not attach until the initiation of adversary criminal proceedings. *See id.* at 456–57 (citing *United States v. Gouveia,* 467 U.S. 180, 188 (1984)).

8

conversation." *Id.*; *see also Rhodes v. State*, 219 So. 3d 251, 252 (Fla. 1st DCA 2017).

## 2.

When a defendant seeks to suppress statements made to law enforcement by claiming his statements were made after he invoked his right to counsel, Florida courts are called upon to "determine whether the accused *actually invoked* his right to counsel." *Davis*, 512 U.S. at 458. Such is precisely the case before us.

While no "magic words" are required to invoke one's *Miranda*-born right to counsel, *see State v. Owen*, 696 So. 2d 715, 719 (Fla. 1997), an accused "must unambiguously request counsel." *Davis*, 512 U.S. at 459; *see also Eversole v. State*, 278 So. 3d 227, 229 (Fla. 1st DCA 2019) (Holding that a suspect must request counsel "clearly and unequivocally" (quoting *Davis*, 512 U.S. at 458)). While an individual is not required to speak with the precision and "discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459 (citation omitted); *see also Washington v. State*, 253 So. 3d 64, 68 (Fla. 1st DCA 2018).

When deciding whether an accused made an unequivocal request for counsel, we consider the totality of the circumstances. *See Washington*, 253 So. 3d at 68 (citing *Deviney v. State*, 112 So. 3d 57, 72 (Fla. 2013)). In the end, however, an accused's "statement either is such an assertion of the right to counsel or it is not." *Davis*, 512 U.S. at 459.

## 3.

Here, Pastor's statements fall woefully short of the clarity required to compel detectives to cease their questioning. After Pastor acknowledged his *Miranda* rights and indicated he was willing to speak to detectives, detectives asked if he could "tell [them] what happened tonight?" Pastor replied:

9

I can, yes. Obviously, I know my rights. I do want a lawyer. I will answer questions. I do want to speak with you. I want the truth to be known. What happened tonight, I felt was just an act of self-defense. I didn't know what else to do just because I don't know this man who's in my house and he's getting angry, and he was trying to take the kids away out of the house. And my mom was like, no, don't do that. And I could just see this incident going on. And so, I mean, that's kind of what spiraled, but.

There simply is no reasonable understanding of this response from which officers could conclude that Pastor's answer was "an expression of a desire to have his attorney present during questioning and deal with police *only through counsel*." *Jones v. State*, 748 So. 2d 1012, 1020 (Fla. 1999) (emphasis added). In this initial response, Pastor said *both* "I do want a lawyer" and "I will answer questions. I do want to speak with you. I want the truth to be known." He then proceeded uninterrupted to tell the detectives he acted in self-defense when shooting Akerberg. There was no break in Pastor's statement and detectives did not interject with any further questions leading him to claim self-defense.

As a result, detectives were permitted to ask Pastor to clarify his intentions[5]—whether he was: (a) willing to speak with them immediately without counsel present (but reserving his right to counsel); or (b) refusing to speak with them at that moment and wanting to speak to detectives at a later time and only with counsel present with him. And as we consider the totality of the circumstances in deciding whether Pastor unequivocally invoked his *Miranda* right to counsel, *see Washington*, 253 So. 3d at 68, we view the entirety of the conversation in the context of Pastor's initial answer affirming both sides of the *Miranda* coin.

---

[5] Law enforcement officers are not required to stop questioning when an accused's request for counsel is equivocal or ambiguous. *Washington*, 253 So. 3d at 68. Further, officers are not required to clarify an equivocal or ambiguous request if the individual was properly advised of his rights. *See id.*

Simply stated, there was no moment during the five-minute meandering conversation concerning Pastor's desire for counsel that he stated clearly and unambiguously that he wanted a lawyer before answering questions. At times Pastor would both acknowledge he wanted to talk to detectives and also wanted a lawyer. He then states, "I believe in the system, and I believe in the truth and the facts. But if it's easier to just wait for the lawyer just to ensure that, then *I guess.*"

When detectives assured Pastor that it is "totally [his]" decision and that they want to be "fair with" him, Pastor then proceeds to ask them two questions of his own seeking clarification as to what would happen if he didn't answer questions and only wanted a lawyer. Importantly, nothing in the law required the detectives to act as Pastor's "legal advisors or personal counselors." *Id.* at 69 (quoting *State v. Glatzmayer*, 789 So. 2d 297, 305 (Fla. 2001)). Rather, when Pastor asked his clear questions, the detectives were required to "stop the interview and make a good-faith effort to give a simple and straightforward answer." *Id.* at 68–69 (quoting *Almeida*, 737 So. 2d at 525).

And they did so. Detectives properly told Pastor they would stop the interview as required by law and proceed with the information available to them. In doing so, detectives answered Pastor's questions in a good faith, straightforward manner and fulfilled their responsibility to "be honest and fair when addressing" Pastor's *Miranda* rights. *Id.* at 69. And having done so, absent Pastor then clearly and unequivocally invoking his right to counsel, questioning could resume. *See id.*

Again, later in the conversation when detectives asked Pastor as to his intentions, he responded:

> At this time, I'll go ahead and say no with that case and just wait for the attorney. But can I just ask one question? At what point would an attorney come? I know there's no guarantee, but what does that look like? I just don't know. If I want to get an attorney, how long would I have to wait for one to come here? Or would they come the first thing in the morning, or would it take days?

Had Pastor stopped after the first sentence, that could be understood as an unequivocal invoking of his *Miranda* right to counsel; but he didn't. He again followed up immediately—without interruption or questions from detectives—to ask additional questions seeking information about when an attorney would come "[i]f [he] want[ed] to get an attorney . . . ." As a result, this statement, in toto, cannot reasonably be understood as a clear and unequivocal request for counsel.

Ultimately, at the end of the conversation, for the first time Pastor is unequivocal—stating, "I'll talk to you. I will, yes. . . . Right now, without an attorney. Yes." Therefore, detectives were free to proceed with questioning him.

4.

Even were we to accept *arguendo* the trial court's conclusion that Pastor unequivocally invoked his *Miranda* right to counsel, suppression of his statements to detectives would still be unwarranted because Pastor himself reinitiated conversation with detectives.

Once an accused has invoked his *Miranda* right to counsel, he is not subject to further custodial interrogation without the benefit of counsel "unless the defendant himself initiates further communication, exchanges, or conversations with law enforcement." *United States v. Roper*, 842 F. App'x 477, 480 (11th Cir. 2021) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). This is another "prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).[6]

---

[6] Nothing in the detectives' conversation can be viewed as "badger[ing]" Pastor or "overreaching," with the design or effect of wearing him down and coercing him to abandon his invoked right to counsel and incriminate himself. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984) ("*Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and

One "'initiates' further conversation with law enforcement when his statements evidence 'a willingness and a desire for a generalized discussion about the investigation.'" *Roper*, 842 F. App'x. at 480 (quoting *Bradshaw*, 462 U.S. at 1045–46); *see also Moak v. Sec'y, Dep't of Corr.*, No. 8:19-cv-2477-VMC-CPT, 2023 WL 1796449, at *5–7 (M.D. Fla. Feb. 7, 2023). And, when an accused has initiated further discussion with law enforcement officers and the totality of the circumstances demonstrate that he knowingly and voluntarily waived his previously invoked *Miranda* rights, authorities may further question him, and any statements made may be used against him. *See Penna*, 385 So. 3d 600–02; *see also Herard v. State*, 390 So. 3d 610, 619 (Fla. 2024), *cert. denied sub nom. Herard v. Florida*, 145 S. Ct. 1315 (2025) (citing *Penna* and affirming the trial court's denial of the defendant's suppression motion when he immediately reinitiated contact with law enforcement); *Roper*, 842 F. App'x. at 480.

Here, if any of Pastor's statements expressing a desire for counsel were understood to be an unequivocal invocation of his right to proceed only with counsel present, in each instance he himself immediately initiated further conversations with law enforcement. He either: (i) followed up a statement requesting counsel with a substantive statement about shooting Akerberg in self-defense; or (ii) asked questions seeking more information as to what would happen next if he refused to answer questions and waited for counsel. Such initiation by Pastor permitted law enforcement to continue their conversation with him.

And, in the end, having received information he sought, the college-educated Pastor told detectives he was willing to answer their questions without counsel. And when he ultimately stopped answering questions and clearly invoked his right to counsel toward the end of the interview, detectives immediately terminated their interrogation and honored Pastor's *Miranda* rights.

---

persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (citation omitted)).

B.

Pastor also argued in his motion to suppress that detectives' continued questioning after his purported invocation of right to counsel under *Miranda* violated the Florida Constitution. Here, too, his argument fails.

Article I, section 9 of the Florida Constitution provides, "[n]o person shall be deprived of life, liberty or property without due process of law, or be twice put in jeopardy for the same offense, or be compelled in any criminal matter to be a witness against oneself." The Florida Supreme Court has made clear that abiding federalist principles place "primacy to our state constitution" and, unless Florida's constitution states otherwise, "the federal constitution represents the floor for basic freedoms while our constitution represents the ceiling." *See Owen*, 696 So. 2d at 719.

However, in the context of an Article I, Section 9 claim, the *Owen* Court concluded that the Florida Constitution "does not place greater restrictions on law enforcement than those mandated under federal law when a suspect makes an equivocal statement regarding the right to remain silent." *See id.* at 720. Accordingly, as goes Pastor's federal constitutional claim, so goes his state constitutional claim.

III.

Accordingly, we REVERSE the order suppressing Pastor's statements and REMAND for further proceedings consistent with this opinion.

It is so ordered.

JAY, C.J., concurs.
EISNAUGLE, J., concurs in result with opinion.

14

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

EISNAUGLE, J., concurring in result.

I agree with much of the majority's analysis. In short, Pastor never unequivocally invoked his right to counsel, and we must therefore affirm the judgment and sentence. However, I write to explain that I would not reach one issue addressed in the majority opinion.

The majority concludes that, whenever Pastor asked a clear question, the detectives properly stopped the interview and made a good-faith effort to provide "a simple and straightforward answer." *Laurito v. State*, 120 So. 3d 203, 206 (Fla. 5th DCA 2013) (quoting *Almeida v. State*, 737 So. 2d 520, 525 (Fla. 1999)). In my view, this issue is separate and distinct from whether Pastor unequivocally invoked his right to counsel, is not before us, and is not necessary to our disposition.[1]

---

[1] I do not reach it as a tipsy coachman issue because, even if the tipsy coachman doctrine were available on this record, we are not using the doctrine to affirm the trial court. *See Robertson v. State*, 829 So. 2d 901, 906 (Fla. 2002) ("This longstanding principle of appellate law, sometimes referred to as the 'tipsy coachman' doctrine, allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.'" (citation omitted)).