# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4001
_____

BERNARD COOLEY,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Okaloosa County.
John T. Brown, Judge.

May 28, 2019

WINSOR, J.

The State charged Bernard Cooley with lewd and lascivious molestation of a child under twelve, and lewd and lascivious molestation of a child between twelve and sixteen. The victim as to each count was Cooley's daughter, who testified that Cooley had molested her for several years, sometimes in Florida and sometimes elsewhere. Cooley's first trial ended with a hung jury, but Cooley's second trial led to a conviction and this appeal.

Cooley presents two arguments on appeal. He first contends that the trial court should have granted his motion to suppress evidence about his post-arrest statements to a Child Protective Investigator (CPI). He argues that the interview was a custodial interrogation that required *Miranda* warnings. Second, Cooley

argues that the court should not have allowed the State to present *Williams* rule evidence of certain instances of molestation that occurred outside Florida. *See Williams v. State*, 117 So. 2d 473 (Fla. 1960); *see also* § 90.404(2)(b)1., Fla. Stat. As to the custodial-interrogation issue, we conclude that the error, if any, was harmless beyond reasonable doubt, *see State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986). As to the *Williams*-rule issue, we find no abuse of discretion. We therefore affirm.

I.

After Cooley was arrested, the CPI interviewed him in jail. According to the CPI's testimony, it was her job—and her statutory duty, *see* § 39.201, Fla. Stat.—to investigate allegations of child abuse. She said reports of child sexual abuse are considered emergencies, typically requiring a response from an investigator within hours. In Cooley's case, she explained, her office received a report from law enforcement soon after Cooley was arrested. She promptly went to the jail to interview him; her purpose, she said, was to "find[] out the family dynamics in this situation." She said she was not acting at law enforcement's direction, although she acknowledged that she did ask Cooley questions about his case and that she discussed the case with a law enforcement investigator.

Before the interview, the investigator did not determine whether Cooley had legal counsel. (The public defender had been appointed by then.) And she did not advise Cooley of his right to counsel or his right to remain silent. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The interview took place in a small room at the prison, and although the door was open, a prison guard stood in the doorway throughout. Cooley later testified that he felt he could not leave.

The interview did not reflect well on Cooley. According to the CPI, Cooley seemed "distraught" and "extremely nervous." Cooley did not directly admit to the abuse, but he did not deny it either. He said he "simply doesn't remember" any abuse. He admitted he had a drinking problem and that sometimes he drinks too much and sleepwalks or does things he does not later remember. He also said that his daughter was a good girl and would not lie about something like that, that his daughter "must be telling the truth," and that he "must have done these things." He repeatedly referred

2

to himself as a monster. ("I'm such a monster. But I don't remember and I don't know.").

Before trial, Cooley moved to suppress evidence about statements he made during this interview. He argued that his interview constituted a custodial interview by an agent of law enforcement. Although the court found that Cooley's statements to the CPI were made while Cooley was in custody, it concluded that the CPI was not acting on behalf of law enforcement when she conducted the interview. Accordingly, the court concluded, Cooley's Fifth Amendment rights were not implicated. The court thus denied the motion to suppress, and the case proceeded to trial.

The victim, by then thirteen, testified at trial that Cooley had molested her for approximately six years. She said she finally told her mother about the abuse in a February 2016 text message. She explained that the night before she sent the text, Cooley had come into her room and grabbed her buttocks over her clothing. He then tried to touch her under her clothes, but she resisted, and he eventually stopped. The victim also described several other instances of abuse that took place in Florida. Then, after the court gave jurors a *Williams*-rule instruction, the victim testified about times Cooley had molested her when she was living in New Mexico, around age seven, and when she lived in Georgia around age ten.

The victim's mother—Cooley's wife—testified that soon after she received the text disclosing the abuse, Cooley called her. Cooley was in the house with the victim at the time; to get him away from the victim, the mother asked Cooley to meet her at the bank. With Cooley then out of the house, the mother went to the house, gathered up the victim and her siblings, and went to police to report everything. While she was there, Cooley called and texted her several times. During at least one phone call, Cooley admitted to the allegations. Phone records and texts were admitted into evidence, and one of the texts said this:

> I love you. Always have. My Demons won. Your (sic) great you are awesome. Keep being that person and I hope I don't and didn't ruin it for the next person. Get that next person great guy. You deserve it. I'm sorry for hurting the family. I wanted to say bye to you. But I don't deserve to speak to you. So I'm sorry. And. Good bye. Don't allow me

to skew your vision of men. I'm a monster. If I had the strength of her, this would have never gone down. I wish we could [have] fixed this. But I understand. I love you and always will. Now it's time to say good bye and not end it with I love you. I ruin that. So I'll say good bye.

Cooley's niece then testified. After the court again gave a *Williams*-rule instruction, the niece explained that when she was around five she lived with Cooley, his wife, and their children. One night while Cooley's wife was out, Cooley put the other children to bed, brought the niece into the living room, and began watching pornographic videos. Cooley told the niece "to do what the people on the computer were doing." The niece complied in part until Cooley's wife returned home, leading Cooley to abruptly stop.

The State also introduced a video of a forensic interview the niece had given. In the video, the niece described the incident consistent with her in-court testimony. The State then introduced a video of a similar interview with the victim in this case. As with the niece's interview, the victim's interview statements were consistent with her in-court testimony.

Cooley testified in his own defense, denying that he had molested either child. He acknowledged that he said his demons had won and that he was a monster, but he said that he was referring to his drinking problem. He also said that some of the text messages he sent his wife were part of his attempt to get her to answer his calls and that he considered them to be a sort of suicide note.

After hearing all the evidence, the jury found Cooley guilty. The court then imposed a thirty-year prison sentence.

## II.

Cooley first argues that his interview with the CPI constituted a *Miranda* violation, requiring suppression of his statements. To determine whether there was a *Miranda* violation in this context, courts must first decide whether there was a custodial interrogation that involved statements made to someone acting on behalf of law enforcement. *Moore v. State*, 798 So. 2d 50, 52 (Fla. 1st DCA 2001) (citing *Rhode Island v. Innis*, 446 U.S. 291, 298

4

(1980)); *Lewis v. State*, 754 So. 2d 897, 900 (Fla. 1st DCA 2000) ("Where either the 'custody' or 'interrogation' prong is absent, *Miranda* does not require warnings."). It is clear that Cooley was in custody during the questioning; the real question is whether the court correctly determined that the CPI was not a state actor under *Miranda*.

In denying Cooley's motion, the trial court relied in part on *Gresh v. State*, in which this court noted that "the primary purpose of such an investigation is to protect the child rather than to gain probable cause to arrest." 560 So. 2d 1266, 1268 (Fla. 1st DCA 1990). That may be true as to the primary purpose, but it does not answer the question of whether the CPI in this case was acting as a state agent. Moreover, the investigators' purpose was not the principal issue in *Gresh*; we held there was no custodial interrogation: "They interviewed appellant at his place of work in the parking lot and it is clear that appellant was free to refuse to participate in the interview. The interview did not take place in an inherently coercive custodial setting nor was there intimidation or coercion of appellant." *Id.*

The trial court also considered *State v. Contreras*, in which the defendant facing molestation charges sought to suppress the victim's statements to child protective investigators. 979 So. 2d 896 (Fla. 2008). The issue in *Contreras* was whether the interview was testimonial (for Confrontation Clause purposes), and the court noted that "the personnel of these [Child Protection Investigation] units have been treated as members of the extended prosecutorial team." *Id.* at 905 (quoting John F. Yetter, *Wrestling with* Crawford v. Washington *and the New Constitutional Law of Confrontation*, Fla. B.J., Oct. 2004). But like *Gresh*, *Contreras* is factually distinguishable: Law enforcement personnel were electronically connected to the investigator during the interview, and they were feeding questions in real time. *Id.* Our decision in *Woods v. State*, which Cooley argues is controlling, is likewise factually distinguishable. 538 So. 2d 122 (Fla. 1st DCA 1989). In *Woods*, the defendant asked for an attorney and refused to talk to a police detective. The detective then asked for a Department of Health and Rehabilitative Services investigator "so that he could obtain information for [the detective] or interview him for his purpose." *Id.* at 123. The detective then gave the HRS investigator keys to

5

the locked interview room where the defendant was held. The defendant made incriminating statements to the HRS investigator, the investigator told the detective, and then the detective and investigator returned and asked questions together. *Id.* Under these circumstances, this court held that the HRS investigator "was acting as an agent of law enforcement when he improperly reinitiated interrogation of appellant shortly after he had invoked his constitutional rights." *Id.*

Ultimately, we need not decide whether the trial court's decision to allow evidence from the CPI interview was error. The harmless-error test still applies when there is a *Miranda* violation, *Deviney v. State*, 112 So. 3d 57, 79 (Fla. 2013), and after a careful review of the record, we conclude "that there is no reasonable possibility that the error contributed to the conviction." *DiGuilio*, 491 So. 2d at 1135. Several considerations lead to this conclusion.

First, the remaining evidence was extensive and consistent. The victim testified as to what happened, and the jury saw video of her earlier interview, which featured a consistent description of Cooley's acts. Cooley's niece, too, attested to similar acts, both through her in-person testimony and her forensic interview, which the jury watched. The mother testified that Cooley admitted the molestation. And officers found Cooley in a hotel, where he appeared distressed and immediately asked them how they found him.

Second, while the mother testified that Cooley confessed, the CPI repeatedly said he did not confess to her. She said he did not specifically deny the conduct but made clear that he did not admit it either.

Third, the most damaging points the CPI testified about were duplicative of other, properly admitted evidence. The CPI testified that Cooley repeatedly referred to himself as a monster, but that fact was never disputed. Text messages put into evidence said the same thing, and Cooley admitted in his own testimony that he called himself that, although he explained it by saying he was referring to his drinking. The CPI also testified that Cooley said his daughter was a good girl who would not lie about such matters. The testimony about Cooley's expressing such a sentiment, while surely damaging, was similar to text messages in which Cooley

6

praised his daughter and maligned himself: "If I had the strength of her, this would have never gone down."; "I'm lost"; "I'm sick"; "I'm a monster"; "I'm a loser."

After "not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict," we conclude that the error, if any, was harmless. *DiGuilio*, 491 So. 2d at 1138.

## III.

Cooley's second argument is that the court should not have permitted the victim to testify about certain uncharged acts, specifically molestation that took place outside Florida. We review only for an abuse of discretion. *Whisby v. State*, 262 So. 3d 228, 231 (Fla. 1st DCA 2018). Cooley does not argue that the evidence is irrelevant. *Cf. id.* at 232 (noting that collateral-crime evidence can be admissible to show propensity in certain sex-crime cases). Nor does he argue that the evidence was inadmissible under the relevant statute. *See* § 90.404(2)(b)1., Fla. Stat. ("In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant."). Cooley's argument instead is that the court should have found that the evidence's "probative value [was] substantially outweighed by the danger of unfair prejudice." § 90.403, Fla. Stat.; *see also McLean v. State*, 934 So. 2d 1248, 1260-61 (Fla. 2006) (noting applicability of 403 balancing to collateral-crime evidence).

We conclude that the trial court did not abuse its discretion. Considering the similarity of the allegations of out-of-state acts with the charged conduct; the fact that the victim was the same in both (Cooley has not challenged on appeal the trial court's separate decision to allow collateral-crime evidence regarding the niece); and the entirety of the record, we cannot say that any reasonable judge would have excluded the evidence under section 90.403.

AFFIRMED.

ROBERTS and RAY, JJ., concur.

7

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Andy Thomas, Public Defender, and M.J. Lord, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Virginia Chester Harris, Assistant Attorney General, Tallahassee, for Appellee.